### In re TOYS "R" US, INC. SHAREHOLDER LITIGATION.

#### Cons. C.A. No. 1212–N.

Court of Chancery of Delaware.

Date Submitted: June 17, 2005.

Date Decided: June 22, 2005.

Date Corrected: June 24, 2005.

---

Andre G. Bouchard, Esquire, and Joel Friedlander, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Norman M. Monhait, Esquire and Carmella P. Keener, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Co–Liaison Counsel for Plaintiffs.

Darren J. Robbins, Esquire, Randall J. Baron, Esquire, and A. Rick Atwood, Jr., Esquire, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, California, Lead Counsel for Plaintiffs.

Joel H. Bernstein, Esquire and Emily C. Komlossy, Esquire Goodkind Labaton Rudoff & Sucharow, LLP, New York, New York, Executive Committee for Plaintiffs.

Thomas J. Allingham II, Esquire, Robert S. Saunders, Esquire, Edward B. Micheletti, Esquire, James A. Whitney, Esquire, T. Victor Clark, Esquire and Kay P. Lawson, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants John J. Eyler, Jr., Frank R. Noonan, Cinda A. Hallman, Peter A. Georgescu, Roger N. Farah, Nancy J. Karch, Arthur B. Newman, Calvin Hill, RoAnn Costin and Norman S. Matthews.

Raymond J. DiCamillo, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware; Joseph M. McLaughlin, Esquire and Tai–Heng Cheng, Esquire, Simpson Thacher & Bartlett LLP, New

York, New York, Attorneys for Defendants Toys "R" Us, Inc. and Richard L. Markee.

Martin P. Tully, Esquire, Jon E. Abramczyk, Esquire, Susan W. Waesco, Esquire, and Jerry C. Harris, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Kirkland & Ellis LLP, New York, New York; Latham & Watkins LLP, Menlo Park, California; Sullivan & Cromwell LLP, New York, New York, Attorneys for Defendants Global Toys Acquisition, LLC and Global Toys Acquisition Merger Sub, Inc.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

This opinion addresses a motion to enjoin a vote of the stockholders of Toys "R" Us, Inc. (the "Company") tomorrow to consider approving a merger with an acquisition vehicle formed by a group led by Kohlberg Kravis Roberts & Co. ("the KKR Group"). If the merger is approved, the Toys "R" Us stockholders will receive $26.75 per share for their shares. The proposed merger resulted from a lengthy, publicly-announced search for strategic alternatives that began in January 2004, when the Company's shares were trading for only $12.00 per share. The $26.75 per share merger consideration constitutes a 123% premium over that price.

During the strategic process, the Toys "R" Us board of directors, nine of whose ten members are independent, had frequent meetings to explore the Company's strategic options. The board, with the support of its one inside member, the company's CEO, reviewed those options with an open mind, and with the advice of expert advisors.

Eventually, the board settled on the sale of the Company's most valuable asset, its toy retailing business, and the retention of the Company's baby products retailing business, as its preferred option. It did so after considering a wide array of options, including a sale of the whole Company.

The Company sought bids from a large number of the most logical buyers for the toy business, and it eventually elicited attractive expressions of interest from four competing bidders who emerged from the market canvass. When due diligence was completed, the board put the bidders through two rounds of supposedly "final bids" for the toys business. In the midst of this process, one of the bidders expressed a serious interest in buying the whole company for a price of $23.25 per share, and then $24.00. The board decided to stick by its original option until that bidder made an offer to pay $25.25 per share and signaled it might bid even a dollar more.

When that happened, the board was presented with a bid that was attractive compared with its chosen strategy in light of the valuation evidence that its financial advisors had presented, and in light of the failure of any strategic or financial buyer to make any serious expression of interest in buying the whole Company—even a non-binding one conditioned on full due diligence or a friendly merger—despite the board's openly expressed examination of its strategic alternatives. Recognizing that the attractive bids it had received for the toys business could be lost if it extended the process much longer, the "Executive Committee" of the board, acting in conformity with direction given to it by the whole board, approved the solicitation of bids for the entire Company from the final bidders for the toys business, after a short period of due diligence.

When those whole Company bids came in, the winning bid of $26.75 per share from the KKR Group topped the next most favorable bid by $1.50 per share. The bidder that offered $25.25 per share did not increase its bid. After a thorough

examination of its alternatives and a final reexamination of the value of the Company, the board decided that the best way to maximize stockholder value was to accept the $26.75 bid. That was a reasonable decision given the wealth of evidence that the board possessed regarding the Company's value and the improbability of another bidder emerging.

In its proposed merger agreement containing the $26.75 offer, the KKR Group asked for a termination fee of 4% of the implied equity value of the transaction to be paid if the Company terminated to accept another deal, as opposed to the 3% offered by the company in its proposed draft. · Knowing that the only other bid for the company was $1.50 per share or $350 million less, the Company's negotiators nonetheless bargained the termination fee down to 3.75% the next day, and bargained down the amount of expenses the KKR Group sought in the event of a naked no vote.

In their motion, the plaintiffs fault the Toys "R" Us board, arguing that it failed to fulfill its duty to act reasonably in pursuit of the highest attainable value for the Company's stockholders. They complain that the board's decision to conduct a brief auction for the full Company·from the final bidders for the toys business was unreasonable, and that the board should have taken the time to conduct a new, full-blown search for buyers. Relatedly, they complain that the board unreasonably locked up the $26.75 bid by agreeing to draconian deal termination measures that preclude any topping bid.

In this opinion, I reject those arguments. A hard look at the board's decisions reveals that it made reasonable choices in confronting the real world cir-

cumstances it faced. That the board was supple in reacting to new circumstances and adroit in responding to a new development that promised, in its view, greater value to the stockholders is not evidence of infidelity or imprudence; it is consistent with the sort of difficult business decisions that corporate fiduciaries are required to make all the time. Having taken so much time to educate itself and having signaled publicly at the outset an openness to strategic alternatives, the Toys "R" Us board was well-positioned to make a reasoned decision to accept the $26.75 per share offer.

Likewise, the choice of the board's negotiators not to press too strongly for a reduction of the KKR Group's desired 4% termination fee all the way to 3% was reasonable, given that the KKR Group had topped the next best bid by such a big margin. To refuse to risk a reduction in the top bid, when the next best alternative was so much lower, can hardly be said to be unreasonable, especially when the board's negotiators did negotiate to reduce the termination fee from 4% to 3.75%. Furthermore, the size of the termination fee and the presence of matching rights in the merger agreement do not act as a serious barrier to any bidder willing to pay materially more than $26.75 per share.

For these and other·reasons that I discuss below, the plaintiffs' motion for a preliminary injunction is denied.

## II. *Factual Background* [1]

### A. *The Plaintiffs*

The plaintiffs in this action, Iron Workers of Western Pennsylvania Pension and Profit Plans and Jolly Roger Fund LP, are shareholders of defendant Toys "R" Us, Inc.[2] They filed their initial complaints in

---

1. These are the facts as I find them for purposes of this preliminary injunction motion.

2. The Iron Workers allegedly owned 7,990 shares of Toys "R" Us stock as of April 30, 2005, and Jolly Roger allegedly owned 369,-

late March, 2005. Rather than immediately press for expedition on their core *Revlon*[3] claims, the plaintiffs delayed until May 20, 2005 to do that, thereby unduly compressing the time available for discovery and consideration of their motion to enjoin the merger vote scheduled for June 22, 2005. Given that the plaintiffs' central claims were based on *Revlon,* rather than on any failures in disclosure, their explanation that the proxy statement for the merger vote was not final until May rings hollow.

The plaintiffs have not, as is sometimes the case in suits like this, offered a competing bid for the company that has been forestalled by a recalcitrant board of directors. Rather, they say they are simply shareholders, supposedly intent upon receiving top-dollar value for their shares. I say "supposedly" because despite their stated belief in the inadequacy of the merger consideration at issue—$26.75 per share—the plaintiffs both sold substantial blocks of their Toys "R" Us shares in the market after the merger announcement, for prices below the per share price offered in the proposed merger. The Iron Workers sold 5,210 shares, or 39% of their holdings at an average price of $25.80; Jolly Roger sold 103,800 shares, or 22% of its holdings at an average price of $26.01.

### B. *The Company And Its Businesses*

Toys "R" Us is a specialty retailer with nearly 1500 stores worldwide. As of all relevant times, the Company had three divisions:

*Global Toys*—This division operates the Company's famous toy stores both domestically and internationally, with the exception of Japan. By far the largest of the divisions, Global Toys accounted for more than $9 billion of the Company's $11 billion in total annual sales, and operates the bulk of the Company's stores. Entering 2004, the problem for Global Toys, particularly in the U.S. market, was its declining profitability, in the face of intense price competition from Wal–Mart, Target and other more diversified "big box" retailers.

*Babies "R" Us*—This is the second largest division in the Company. Babies "R" Us operates over 200 specialty retail stores that sell a full range of products for expectant mothers and babies. The division has experienced impressive growth in recent years and has higher profit margins than Global Toys. By one measure, Babies "R" Us contributed approximately half of the Company's operating earnings in 2004.

*Toys Japan*—This division operates a chain of toy stores in Japan under the Toys "R" Us brand name. The Company only owns 48% of this chain. The parties in this case generally agree that Toys Japan comprises only around $1.00 per share of the Company's overall value.

The operating relationship among the divisions is important to understand. As might be expected, the Company had tried to capitalize on economies of scale by using common distribution networks, information systems, and other back-bone services to operate the three divisions. Therefore, although the Company reported the divisions' results separately, they did not in fact function with operational autonomy.

700 shares. The plaintiffs claim that the Jolly Roger Fund is managed by a hedge fund, Pirate Capital LLC, which also manages a second fund, the Jolly Roger Offshore Fund, Ltd., which holds 1,336,300 additional shares of Toys "R" Us common stock. Jolly Roger Offshore Fund, however, is not a party in this case.

**3.** *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1986).

One critical implication of that reality for present purposes is its effect on the value of Babies "R" Us. The Company's public filings likely understate the extent to which Babies "R" Us has been subsidized by Global Toys. That subsidy consists of overhead that Babies "R" Us uses but that is actually charged to the Global Toys division, a practice that results in an inflation of the Babies "R" Us division's profits to the corresponding detriment of the profits of Global Toys. In this same vein, it is notable that in 2004 Babies "R" Us contributed only $245 million to the Company's total of $787 million in EBIT-DA. For these reasons, the Company's management and board do not consider Babies "R" Us to be equally as valuable, either in terms of assets, revenues, or profits, as Global Toys.

Another important implication of the operational entanglement of the various divisions is its effect on the practicability of selling them as separate units. Babies "R" Us was not positioned to operate independently immediately upon a sale. Any buyer would be dependent for some substantial period on transitional services to be provided by the Company. And, of course, once Babies "R" Us acquired the functional capacity to conduct all of its required operations autonomously, its ongoing costs of operation would increase materially, perhaps by more than $100 million annually.

### C. *The Management And Board Of The Company*

The Company's board of directors consisted of ten members. The plaintiffs concede that nine of those members are independent, non-management directors. The one inside director was the Company's Chairman and Chief Executive Officer, de-

fendant John H. Eyler, Jr. Eyler had joined Toys "R" Us as CEO in 2000. That position was just the most recent in a succession of high-level executive positions Eyler had held within the retail industry. Eyler had served as CEO of toy retailer FAO Schwarz for the eight years preceding his joining Toys "R" Us.

For present purposes, one committee of the board bears particular mention. The Executive Committee of the board is comprised of four members. Eyler chairs the Committee, which is also comprised of the chairmen of the board's other committees. The other members are Arthur Newman, Roger Farah, and Norman Matthews. Notably, Matthews and Farah each have considerable experience in retail. Matthews has been involved in retail for nearly 30 years, serving on the boards of Federated and Hills Department Stores. Farah is CEO and director of Polo Ralph Lauren, and before that served in a top position at Federated.[4]

### D. *The Board Seeks A Cure For The Post–Holiday Financial Blues*

The present *Revlon* case has counterintuitive origins. Several of our most prominent *Revlon* cases arose as consequences of CEO-driven decisions to embark on and stubbornly adhere to a specific business strategy, even when higher-value alternatives presented themselves. Neither the secondary role played by the independent directors nor the lack of suppleness displayed in those cases is present in the current scenario. And that was true from the get-go.

By the end of 2003, Toys "R" Us faced daunting challenges. As adverted to, its domestic toy stores faced withering price competition from discount merchandisers

---

**4.** Most of the other board members also have for-profit business experience that would, it is reasonable to assume, enable them to deliberate together to fashion reasonable judgments about business issues facing Toys "R" Us.

like the powerhouse from Bentonville. Not only that, the preferences of children were changing. As the electronics industry has churned out a variety of products making televisions and computers even more dangerously addictive usurpers of time and brain cells, children of increasingly younger ages have eschewed traditional toys, the enjoyment of which require blends of physical exertion and imagination, in favor of the chair-bound pleasures that can be delivered by a Gameboy.

These challenges were reflected in disappointing sales during the Company's crucial Christmas holiday season in 2003. Domestic toy sales declined nearly 5% over the prior year's holiday period, and were flat internationally. The Company's stock price was affected by the market's understanding of the Company's difficult competitive position. For much of December, Toys "R" Us shares traded below $11 apiece.

When the new year began, the Company began to consider ways to pull out of these doldrums and deliver more value to its stockholders. In a call with analysts to announce the disappointing holiday sales results, Eyler confirmed that the Company was likely to embark on a serious examination of strategic options to improve the Company's ability to use its valuable assets to deliver returns to its investors. The day he did that, January 8, 2004, Toys "R" Us shares closed at $12.00 per share.

At a meeting on February 11, the board made several decisions to facilitate a thorough strategic review. The board retained an investment banking team from the retail group of Credit Suisse First Boston ("First Boston") to help it develop and evaluate its options. In connection with that review, the board focused on an important part of the value of the Global Toys division—its real estate. Although the operations of Global Toys were suffering, that division owned many of the properties on which its stores operated. Those properties were very valuable in a hot real estate market, a fact which presented the Company with the options of: selling off its real estate portfolio entirely; closing its least profitable stores and selling the properties on which they were located, and thereafter operating a lower cost toy retailing business; or marketing Global Toys to buyers who might be well-equipped to execute on either of those strategies. To get a handle on the true value of Global Toys, the board decided to get updated information on the value of its real estate holdings.

To ensure that the board had a wide range of options, it also supported Eyler's decision to create an internal management team that would, working in isolation from First Boston, brainstorm about options. In that way, the board could receive a range of ideas from two sources working independently, thus maximizing the chance of capturing all rational ideas for consideration.

On a somewhat different, but also important front, the board acted to guarantee the fairness and reasonableness of its approach to the strategic review. The board retained the law firm of Skadden, Arps, Slate, Meagher & Flom to advise them as to their legal and equitable duties in the review process.

After the February 11 meeting, the internal management and First Boston teams began working in earnest to develop a set of options for the board to consider. During this period, the Executive Committee met on several occasions, each time discussing and providing guidance for the ongoing strategic review. As would be expected, the public announcement of a strategic review had piqued the interest of entities that saw value either in the Company's assets or in the Company as a whole. Some of these interested parties

made soft overtures about what they would like to purchase. For example, Best Buy, Home Depot, PETsMART, Staples, and Office Depot each expressed an interest in a portion of Global Toys' real estate portfolio. The Executive Committee decided that it would be premature for First Boston to begin shopping all or part of the Company to buyers until the board was in a position to consider the options the strategic review developed.

### E. The Board Concentrates On A Discrete Set Of Strategic Options

At a three-and-a-half hour, June 1 board meeting, First Boston and the internal management team reported the results of their consideration of the Company's options. From the myriad of possibilities that they had pondered came forth four options that were deemed worthy of more in-depth analysis:

- Continuing to operate the Company as a single retail entity but reducing substantially the number of toy stores and overall operating expenses. In connection with this and all the other options, First Boston recommended making a public offering of the Company's Toys Japan equity interest;

- "Monetizing" the value of Babies "R" Us by spinning or splitting it off to the stockholders. Under this alternative, Company stockholders were envisioned to end up holding shares in two public companies: Toys "R" Us (essentially Global Toys) and a new public Babies "R" Us;

- Selling Global Toys and monetizing the Babies "R" Us division by a spin- or split-off or by a sale. One of the problems identified with this scenario was that if Babies "R" Us was sold first, the tax ramifications to the Com-

pany and its stockholders could be substantial, as the tax basis for that division was very low and there was the possibility that capital gains taxes would be exacted at the Company level and, upon distributions to the stockholders, at the investor level. A later sale of all or part of Global Toys at a capital loss, however, was identified as a possible way to decrease this risk to some extent;

- Retaining Babies "R" Us as the Company's sole remaining retail division and selling Global Toys.

First Boston did not recommend to the board that it focus on the sale of the entire Company because, as the minutes state, First Boston "did not believe there was a buyer for the whole company."[5] This, as we now know, did not turn out to be a good prediction. First Boston's actual written presentation to the board was closer to the mark, indicating that "the universe of potential acquirors for the entire [Company] is extremely limited."[6]

There is absolutely no inkling to be had from the record that the decision not to focus on a sale of the Company as a whole had any origin in a desire by Eyler or any other member of the board to continue in their positions as fiduciaries of an operating company.

The next day, June 2, the board met again for most of the day. A healthy portion of the meeting involved a board discussion of the issues considered the previous day regarding the strategic review process. The board asked more questions, debated the pros and cons of the various options, and discussed the work needed to be done in order to make a decision whether to pursue one of the four options man-

---

5. JW Aff. Ex. 9 at 20.

6. JW Aff. Ex. 25 at 192.

agement and First Boston had urged be their focus.

F. *In Connection With The Presentation Of Strategic Options, The Board Is Fully Briefed On The Possible Value Of The Company And Its Various Divisions*

As a precedent to its presentation of options on June 1, First Boston had first briefed the board on its "sum of the parts" valuation of the Company. The resulting value range for the entire company was between $4.325 billion and $6.125 billion (or between $14.11 and $22.19 per share). Of those values, Global Toys was valued at between $2.85 billion and $3.75 billion (or between $11.40 and $15.00 per share). By comparison, Babies "R" Us was valued at between $1.7 billion and $2.1 billion (or between $6.80 and $8.40 per share).[7]

Because the plaintiffs focus on the value of Babies "R" Us so intensely in their arguments, it is worth highlighting the valuation information First Boston presented to the board regarding that division. That information included two methods that are useful in estimating what the board could reasonably expect that division to sell for in a sale to a third party. The first was a discounted cash flow valuation, the base case of which valued Babies "R" Us at between $1.75 billion and $2.2 billion (or between $7.00 and $8.80 per share). The second was a comparable transactions analysis that valued Babies "R" Us using the acquisition multiples paid in sales of comparable companies—i.e., sales of whole retail companies. The value range produced by that method was between $1.8 billion and $2.15 billion (or between $7.20 and $8.60 per share).

Put simply, as of June 2004, the board had already received a thorough analysis of the value not only of the Company as a whole, but of its various divisions. Not only that, First Boston's input was also supplemented by information about the value of the Company's real estate, which was developed by an outside expert consultant.

G. *The Board Decides That Selling Global Toys Is The Best First Strategic Move To Make*

After the two board meetings on June 1 and 2, management and First Boston refined their analyses of the four core options. At a lengthy July 13 meeting, the board considered detailed presentations regarding the various options. By that time, Eyler had begun focusing on a separation of Global Toys and Babies "R" U.S. as a core element of a value-maximizing strategy, and made a detailed presentation regarding some means for accomplishing that end. The board did not make any decision to pursue or reject any option at that meeting, but directed that further analysis of each option continue.

In order to guarantee that the board could devote sufficient time to selecting an option at its next meeting, the directors decided to double the length of their August 10 meeting and to make themselves available for telephonic meetings earlier if developments warranted. Notably, the board held an executive session, from which Eyler was excused. During that session, the independent board members indicated that they were leaning towards a total spin-off of Babies "R" Us as a preferred option if there was to a be a separa-

---

7. For ease of converting total dollar values to per share values, the parties have stipulated that, as a rule of thumb, every $10 million dollars of transaction value is roughly equivalent to 4¢ of per share value. The per share values described here are calculated on that basis, as are many of the values in the rest of this decision. When possible, I have lifted per share numbers directly from the record.

tion of that division. But no firm decision was made about that.

On July 19, a consortium of bidders including Cerberus Management, L.P. and GS Capital Partners (i.e., the private equity vehicle for Goldman Sachs) sent the Company a formal expression of interest in purchasing Global Toys for between $2.6 billion and $3.0 billion (between $11 and $13 per share) in cash. According to Cerberus, its offer would give the Company stockholders total value of $20 to $23 per share, on the assumption that the remaining business of the Company after a sale of Global Toys—i.e., primarily Babies "R" Us—would trade at $9 to $10 per share. Another credible private equity buyer, headed by Apollo Advisors, also orally expressed interest in buying Global Toys.

In light of Cerberus's expression of interest, which was in a range First Boston found attractive, the board convened telephonically on July 27. After a discussion of pertinent issues, the board authorized First Boston to inform both Cerberus and Apollo that the Company would be prepared to hold discussions with them after the board's August 10 meeting. So as to enable the Company to make a more thorough market canvass for interested purchasers of Global Toys, First Boston was instructed to put together offering and due diligence materials "as quickly as possible." [8]

On August 10, the board met as scheduled. The meeting lasted a full 10 hours. During the course of the day, the independent directors spent three hours in executive session. By this meeting, the Company had retained Simpson, Thacher & Bartlett LLP to provide legal advice in connection with any transactions the Company might effect as a result of the strategic process. By this means, the board could utilize Skadden exclusively as an ad-

visor to the board itself, and let Simpson Thacher act as deal counsel on behalf of the Company—a role that would naturally involve constant interaction with management. Consistent with this division of labor, Simpson Thacher attorney John Finley was excused from most of the board's executive sessions, but Skadden's David Fox remained.

During the no doubt exhausting discussion of options, the board focused on a number of issues, including whether Global Toys should, if retained, be liquidated or continue to operate. The board preliminarily concluded that stockholders would obtain more value if the division continued its retail operations—but only at much lower costs. The board recognized that the feasibility of this option depended on the Company's ability to cut costs sharply without adversely affecting sales, and that the results of 2004's holiday sales would provide important data regarding the relative value of liquidation or operation.

In that same connection, First Boston presented the possible impact that the Cerberus offer could have on stockholders, concluding that it might generate $21.26 a share—a price "substantially higher than" the value that was projected if the Company continued to operate as a single unit, even assuming the substantial cost reduction strategy being contemplated for Global Toys.

At the end of the day, the board decided to approve a strategy focused on separating Global Toys and Babies "R" Us, either by selling Global Toys or by spinning off Babies "R" Us. Management was authorized to publicize this strategic direction through a press release that the board had reviewed in its executive session. In the press release, the Company said that it was pursuing a separation in order to in-

---

8. JF Aff. Ex. 11 at 39.

crease shareholder value, and that its means of moving forward included "explor[ing] the possible sale of the global toys business as well as ... prepar[ing] for a possible spin-off of Babies "R" Us."[9] Consistent with that direction, the Company announced that it would begin to separate the operations of Global Toys and Babies "R" Us, designating Richard Markee, Eyler's number two, as the manager who would become CEO of Babies "R" Us when the separation became a reality. This move, which Eyler supported, meant that Eyler was likely, if things worked out, to be out of a job, because the momentum at that time was towards an outcome that did not involve continued ownership or operation of Global Toys.

### H. *First Boston Begins To Market Global Toys*

As of the time the board authorized First Boston to solicit buyers for Global Toys, a bit of an informational divide had already arisen between First Boston and the board. By then, several parties had expressed some interest in purchasing not simply some of the assets of the Company, but the entire Company. Eventually, First Boston heard from eleven sources that expressed interest in buying the entire Company. Because none of these overtures was advanced with even the formality of a letter, First Boston did not change its initial impression that selling the whole Company was unlikely to be the best way to increase shareholder value. Either because it viewed the inquiries concerning the sale of the whole Company as lacking in seriousness or through an oversight, First Boston did not report those tentative expressions of interest to the board. Accordingly, both First Boston and the board placed greatest emphasis on a sale of Global Toys.

To that end, First Boston contacted 29 potential buyers for Global Toys, indicating that a confidential information memorandum was available. None of the 29 potential buyers was a so-called "strategic buyer" and apparently for good reason. At oral argument and in their briefs, the plaintiffs have been unable to identify any existing retailer that would have a plausible strategy for combining itself in a synergistic manner with Global Toys. Although some retailers had contacted First Boston when it first became clear that the Company was evaluating all of its strategic options, they had done so because of an interest in the Company's real estate.

The 29 financial buyers First Boston contacted are a "who's who" of private equity funds. Among them was Kohlberg Kravis & Roberts, which had signaled an interest in Global Toys, and, indeed, in the whole Company in August. Naturally, Cerberus and Apollo were included, along with other prominent names, like Bain Capital, CVC Capital Partners, and Blackstone.

By early October, 25 of the 29 potential buyers had signed confidentiality agreements in order to see the offering memorandum. On October 12, they were all invited to make preliminary bids by November 2, 2004. When the date for preliminary bids arrived, nine bids came in, some of which were consortia bids from private equity firms that had joined together as bidding partners. Of the bids, six were for Global Toys as a whole and three were for the international operations of Global Toys. Among the six Global Toys bidders were the Cerberus consortium (which by then was comprised of seven of the 25 offering memorandum recipients), Apollo (joined by one of the other 25 recipients), KKR, and a consortium comprised

---

9. JF Aff. Ex. 14.

of Bain Capital and Vornado (both of which were among the 25 recipients).

The Executive Committee met on November 3, 2004 to review the preliminary bids. During the portion of the minutes that briefly describe that review, it is stated: "In response to a question, [First Boston] indicated that none of the bidders expressed any interest in acquiring the Corporation [as a whole]."[10] That answer, however, was completely accurate only in one limited, albeit contextually important, respect.

Given the context, it is inferable that First Boston construed the question as relating narrowly to whether the written expressions of interest, received the day prior, included any indication of interest in the entire company. This possibility is heightened, of course, because some of the bidders had only bid for part of Global Toys. To the extent that First Boston understood and answered the question this narrowly, its response was accurate.

From the record before the court, it appears to be possible that the directors read this answer to mean something broader; namely, that none of the nine bidders had "expressed" in the more day-to-day, informal sense, any interest in making a bid for the whole company. As one of First Boston's key bankers on the matter has admitted, the minutes are in that sense erroneous. By November, both Cerberus and KKR had already suggested that if they were going to buy Global Toys—which comprised the bulk of the Company's sales and of its physical assets—they might want to buy the whole enchilada. This possibility was not signaled to the Executive Committee by First Boston then.

What had become clear to the Executive Committee was that some of the preliminary bids for Global Toys seemed to be at very attractive levels. The sale of Global Toys therefore looked like the option for separation that would deliver the most value for Company stockholders. As a result, the Executive Committee decided to put the idea of a Babies "R" Us spin-off on hold pending the outcome of the sales process. Among the reasons for that decision was the recognition that any buyer of the Global Toys business would expect to negotiate the terms on which Global Toys would provide transitional overhead services (like distribution, information systems, etc.) to Babies "R" Us after a sale. Another obvious reason was that there would be no need for a spin-off of Babies "R" Us if Global Toys was sold, because Babies "R" Us would then exist as a stand-alone company owned by the Company's existing stockholders anyway.

Consistent with earlier thinking, the Executive Committee resolved to pursue a sales process for Global Toys that would culminate once the results from the 2004 Christmas shopping season were known. The Executive Committee believed that bidders would want to know those results before making final, binding bids.

Importantly, the Executive Committee also discussed candidly the notion that the bidders would necessarily want to meet with company management and might have an interest in keeping all or some of the key managers. Eyler agreed to instruct his subordinates that they could not discuss the possibility of working with any of the bidders until specifically authorized to do so by the board. Eyler also committed to share with the Executive Committee "any approaches he might receive from interested bidders and his attitude to working with any of them."[11]

---

**10.** JW Aff. Ex. 14.

**11.** JW Aff. Ex. 14.

On November 18, the full board met and accepted the recommendation of the Executive Committee to proceed with a sale of Global Toys, and to defer any plan to spin off Babies "R" Us.

I. *The Final Round Bidders For Global Toys Perform Extensive Due Diligence, Begin To Negotiate Specific Contract Terms, And Prepare To Make Final Bids*

In December, a due diligence frenzy ensued. By the end of that process, four bidders were left—KKR, Cerberus, Apollo, and the Bain/Vornado group. That same month, Simpson Thacher sent each of the four a draft asset purchase agreement and began to discuss terms with each of them.

On January 7, 2005, First Boston sent each of the final bidders instructions for submitting a final bid for Global Toys, with a deadline of February 15. In connection with that bid, it was significant that the Company's results for the 2004 holiday season were improved from the year prior. Although these results would not normally be released until the Company announced them in its 10–K for the fiscal year ending January 29, 2005 in mid March, the plaintiffs concede that the final bidders were aware of this information, presumably as a part of their continuing due diligence investigation. As it turned out, the company needed to delay the release of these earnings beyond the anticipated March 17, 2005 release date because its accountants, Ernst & Young, indicated that the Sarbanes–Oxley Act raised some question about the way the company (and other retailers) traditionally accounted for leases. Although this new rule did not affect the Company's operating results, it did affect its ability to complete its financial statements. To facilitate attractive bids, the Company shared the improved holiday results with each of the four bidding groups.

On January 21, the board met and authorized the Executive Committee to make day-to-day decisions about the sales process, in order to facilitate a timely response to developments as they arose. Consistent with that delegation, the Executive Committee met on February 9 to discuss Cerberus's request to First Boston that it be permitted to bid for the entire company, not just Global Toys. Cerberus "did not wish to bid upon the entire Corporation if the Board of Directors would be opposed to such bid." [12]

The Executive Committee debated what to do about that overture:

> After discussion, the Committee unanimously agreed that [First Boston] should advise the representatives from Cerberus that Cerberus should make a bid for [the Company] as originally outlined and communicated several months ago. In addition, the Committee agreed that Cerberus should not be discouraged from making a bid for the entire Corporation. [13]

That position was communicated with Cerberus, giving it a green light to broaden the process's focus.

On February 17, the four supposedly "final" bids came in, and had the following descending values:

- KKR—$3.407 billion or $13.62 per share;

- Apollo—$3.302 billion or $13.21 per share;

- Cerberus—$3.275 billion or $13.10 per share;

- Bain/Vornado—$3.183 billion or $12.73 per share.

---

**12.** JW Aff. Ex. 19 at 1.

**13.** *Id.*

In addition to its bid for Global Toys, Cerberus offered to buy the whole Company for $23.25 per share, subject to due diligence on Babies "R" Us. Bain/Vornado also expressed an interest in buying the entire Company but did not state a price.

The Executive Committee met on February 21 to evaluate the bids. It considered them to be very attractive. Although the Committee was intrigued by Cerberus's $23.25 bid, it did not consider that price to be sufficiently attractive to halt a push towards a sale of Global Toys. Rather, it resolved to remain open to an expression of interest in the whole company by Cerberus or any other of the final bidders that would cause it to rethink its position, but did not instruct First Boston to tell all the bidders to make a whole Company bid. Instead, First Boston was instructed to extract from the final bidders yet another "final" bid on Global Toys, while signaling, if asked, that the board would consider any whole Company offer with an open mind.

The plaintiffs consider this an important juncture in the process. Because some of the key bidders were trying to play strictly by the rules, in particular KKR, they did not concentrate on making a whole Company bid out of a concern that they would not be respecting the Company's decision to concentrate on a sale of Global Toys. The plaintiffs believe that some bidders who were contacted earlier about buying Global Toys might have dropped out of the process early because they respected the Company's decision not to market itself as a totality, and that they might have remained if they knew they could buy not just Global Toys, but the whole Company.

As will be discussed, that concern does not emerge as one that is grounded in economic logic or marketplace etiquette.[14] What is more likely is that a serious bidder like KKR, who wanted to come away at least with Global Toys, wished to conduct itself in a manner that was most conducive to that end. Absent a signal that a bid for the whole was sought, KKR decided to concentrate on presenting a bid for Global Toys.

In that regard, the plaintiffs point out another feature of KKR's bidding strategy. In its February 17 bid, KKR had conditioned its offer on "retaining key members of management." The plaintiffs say that this gave Eyler an expectancy that he could participate in any KKR buyout of Global Toys as a manager. But, the Company negotiated with KKR to eliminate this provision. Moreover, the record indicates that Eyler did his part to keep the process pristine, and refused to consider any offers by KKR or any other bidder until the board had concluded a deal.

### J. "Final Final" Global Toys Bids Come In And Cerberus Throws A Curve Ball

The Company had received "final final" Global Toys bids by March 7. KKR increased its bid, such that its offer could result in proceeds to be paid out to the Company stockholders of $3.46 billion or $15.54 per share. KKR topped Cerberus's bid by a small margin, and the Apollo and Bain/Vornado bids by a greater increment.

The board met on March 7 to consider this round of bids. In its presentation to the board, First Boston indicated that the KKR bid could generate a range in total value for Company shareholders of $24.23 to $26.56 per share. This assumed that Toys Japan was worth about $1.00 per

---

**14.** Anyone outside the formal competition for Global Toys would have had different incentives than KKR. Absent a move to the hoop by a bidder outside that competition, such a bidder could not hope to buy at all. KKR was already in the tournament, and wished to come away with a trophy by engaging in sportsmanlike behavior that it hoped would maximize its chances to win.

share and that the Babies "R" Us unit had a value of between $7.89 and $10.07 per share. In the meeting, the board focused on the fact that Babies "R" Us was likely to face increased annual operating costs of $85 million or more annually, and that for every $10 million those costs grew, the value of that business would decline by 30¢ per share.

By the March 7 meeting, Cerberus had increased its offer slightly for the whole Company, indicating that it would pay $24 per share with due diligence on Babies "R" Us, and $23.25 without additional due diligence. Because KKR's most recent Global Toys bid implied a value for the whole Company of at least $24.23 per share, the board was not interested in Cerberus's latest proposal. Nevertheless, the proximity of Cerberus's whole company bid to a value-maximizing level suggested that an attractive bid for the whole company might be had.

Therefore, the board had a specific discussion of the business risks associated with extending and/or opening up the bidding process. The board determined that the risk of losing the proverbial "birds in hand"—the very attractive bids for Global Toys—was too great for the board to tell the bidders that it was opening up the process either to allow the existing bidders to bid for the whole Company, much less the more drastic, time-consuming step of seeking a wider range of bidders to look at the whole Company. To the directors, it seemed entirely possible that the remaining bidders, who had invested in months and months of due diligence, and had submitted two rounds of multi-billion dollar "final bids," might not tolerate the further delay that would result from a new market canvass and the inclusion of new parties who would have to do due diligence from scratch.

On the other hand, the directors were willing to take some measured risk, in order to leave open the possibility of obtaining a whole Company bid from the final set of bidders that would maximize shareholder value. To that end, the board decided that if Cerberus was willing to increase the price and closing certainty of its whole Company bid, then the Executive Committee could authorize the other bidders to make a similar bid. This would give the board a chance at its March 16 meeting to either proceed with a sale of Global Toys, knowing that was the best alternative, or a sale of the whole Company. The board feared that delaying the process much beyond that date risked the departure of some of the bidders.

K. *Cerberus Ups The Ante To $25.25 For the Whole Company And The Final Bidders Are Invited To Join In An Auction For The Whole Company*

That same evening, Cerberus, after discussions with First Boston, improved its whole Company offer to $25.25 per share, without a due diligence condition, and signaled that it might move that bid north. First Boston and Eyler discussed that bid, which was solidly within the range of values implied by KKR's high bid for Global Toys.

What happened next is a source of some modest controversy. The plaintiffs fault Eyler and the Executive Committee for not meeting. But they slight what did, I conclude, most likely happen. Realizing that it was difficult to get the entire Executive Committee together at one time, Eyler called each of the members individually and spoke with them about the new development.

The new Cerberus bid was precisely the kind of development that the full board had just discussed the morning of March 7. Consistent with the approach the board had articulated, the Executive Committee members, in their discussions with Eyler, agreed that the new Cerberus bid justified taking the risk of asking the final bidders

to submit a bid for the whole Company, to be made after a rapid period of due diligence on Babies "R" Us. They reasoned that any likely bidder for the whole Company would have had to have been interested in Global Toys, as that was the Company's most valuable asset. Furthermore, through the existing due diligence process, the bidders already knew a lot about Babies "R" Us, and that business was not so complex that the bidders needed a lot of time to conduct due diligence on it.

On March 8, therefore, First Boston asked each of the final bidders to bid for the whole Company but to keep their Global Toys bids on the table. On March 10, the Wall Street Journal printed a story referencing the earlier $23.25 Cerberus bid, and indicating that Cerberus thought "it made no sense" to separate Global Toys from Babies "R" Us, "in part because the units share operations such as warehouses." [15] The article made clear that the figure referenced might have been dated and that new higher bids might be on the table. The article also indicated that the Company had initially resisted Cerberus's interest in the whole Company but that its resistance was "easing" and that it was now "talking further to the bidders." The article further mentioned that KKR was also interested in the entire Company.

Given the nature of the article, any rational capitalist not in the bidding process, who somehow had missed the notion that the past year had been a propitious time to make a bid (solicited or not) for Toys "R" Us, would certainly realize that it was a great time to send in an expression of interest, asking to join in a bidding process. None did, and the only parties that prepared bids for the whole Company were the ones that would logically be expected to do so: those who had been seriously interested in buying the Company's most valuable division.

After First Boston invited bids on the whole Company, each of the remaining bidders maneuvered for advantage. For its part, Cerberus tried to pressure the Company into giving it a leg up on the other bidders. On March 11, it threatened to withdraw its $25.25 offer if the Company did not enter into an exclusivity agreement with it. The Company did not assent to this demand and Cerberus backed down.

The same day, the Company heard from two of the final four competitors—KKR and Bain/Vornado—who wished to band together to present a joint bid for the entire Company. Their rationale was that the additional capital, and therefore overall portfolio risk, a whole Company bid entailed made it imprudent for either group to proceed alone. · Therefore, KKR/Bain/Vornado (the "KKR Group") wished to do what Cerberus and its partners (like Goldman Sachs) had already done—form a consortium to present a joint bid. Hoping to elicit a good offer (and to avoid getting no bid at all), First Boston and Eyler agreed to green light a joint bid. Later that day, the KKR Group signaled that it was prepared to bid $26 to $26.50 per share or even higher for the Company, subject to due diligence.

For its part, Apollo balked at moving quickly. It ventured the possibility of a bid of $24 to $26 if it could have two to three weeks more due diligence. Eyler and First Boston were cool to this idea, however. They pressed to bring the process to a head at the March 16 board meeting, consistent with the board's concern that stretching the process out further put valuable bids at risk. In considering a short due diligence period for Babies "R" Us reasonable, they took into account the extensive due diligence provided to the

15. JF Aff. Ex. 36.

bidders about the rest of the Company, the relatively simple nature of the Babies "R" Us business, and the fact that there was plenty of public information already available on Babies "R" Us. Moreover, each of the bidders, in preparing to bid on Global Toys, had developed an understanding of the Babies "R" Us business by studying its entanglement with Global Toys in its warehousing, distribution and information systems. Negotiating the required workout agreements required that.

As a result, they offered the bidders the chance to conduct focused due diligence on Babies "R" Us over a course of several days, with the goal of having final bids in on March 16, in advance of the board meeting that day. In the interim, Simpson Thacher began negotiating with Cerberus and the KKR Group on the framework of merger agreements. Because of its importance to the plaintiffs' arguments, I discuss that process more later. For now, it bears emphasis that the preparation of those agreements did not begin the contract formation process, rather that process naturally evolved from the earlier negotiation of asset acquisition agreements for the purchase of Global Toys into haggling over full-blown merger agreements.

L. *Final Bids Come In—The KKR Group Tops Cerberus By $1.50 Per Share And The Board Signs Up A Merger To Sell The Whole Company For $26.75 Per Share*

The board convened early the day of March 16. First Boston reported on the

bids that had been received for the whole Company. It noted that Apollo had indicated that it would consider bidding in the $24 to $26 range, but that it wanted two to three weeks of due diligence before doing that. Cerberus, meanwhile, had stuck by its $25.25 per share bid, despite having earlier hinted that it might raise its bid by a buck or so after the additional Babies "R" Us due diligence.

The KKR Group topped the Cerberus bid by a large margin, offering to pay $6.6 billion or $26.75 per share.[16] The $6.6 billion offer beat Cerberus's bid by $350 million or a full $1.50 per share.

The board, as noted, had elicited bids with the idea that they could then choose between the option of selling just Global Toys or selling the whole Company, but through a process that did not risk losing the Global Toys bids that were already on the table. To help the board decide between these two strategic options, First Boston presented the board with a detailed presentation on the value of the various options, and, most importantly, of the Company as a whole.

That information, it is important to emphasize, was simply the latest version of the detailed valuation information and analysis that the board had considered during its, by then, nearly year-long strategic process.[17] At the meeting on March 16, 2005, First Boston updated that existing information to the board by presenting: 1) a historical review of the bidding

---

**16.** Early in the day, the board was told that the KKR Group would pay $27.00 per share, but that was premised on a misunderstanding by the KKR Group of the Company's number of fully diluted shares. The $6.6 billion figure remained constant.

**17.** *See, e.g.,* JF Aff. Ex. 26, CSFB Project Toddler Preliminary Discussion Materials

from February 21, 2005 (including the then current bids of the four remaining bidders from Global Toys, ranging from $3.302 to $3.407 billion; a valuation of Global Toys using a DCF model yielding a range from $3.206 to $3.968 billion; and a preliminary valuation of Babies "R" Us using both DCF and selected companies analysis models yielding a range of $1.75 to $2.25 billion).

process; 2) a review of the KKR Group offer of $26.75 for the entire Company; 3) a breakdown of the implicit values of the Company based on the current Global Toys bids; and 4) a valuation of the entire Company using DCF, selected companies, and selected acquisitions analysis models.

First Boston's traditional valuations of the entire Company produced three ranges: a DCF with a range of $19.60 to $25.58 per share, a selected companies model with a range from $16.35 to $20.98 per share, and a selected acquisitions model with a range of $19.32 to $27.04 per share. Significantly, the mid-points of these ranges were $22.59 for the DCF, $18.67 for the selected companies model, and $23.18 for the selected acquisitions model. Thus, the KKR Group bid significantly topped the mid-point of all three valuations, and topped the high-points of two of them.

Additionally, First Boston calculated the valuation of the entire Company implied by the current outstanding bids for Global Toys. This sum-of-the-parts model incorporated a valuation of Babies "R" Us of $7.76 to $10.13 per share. To generate this range, First Boston incorporated both an existing selected companies valuation with an updated DCF analysis of Babies "R" Us.[18] The resulting range yielded an implied total company value range of $23.00 to $25.76 per share. The then-current DCF analysis showed a somewhat higher range cap, but even using this higher figure yielded a high-end valuation of $10.51 per share for Babies "R" Us and a high implicit valuation range cap for the total company of $26.14,[19] still below the KKR Group's bid of $26.75.

As will be discussed in full later, First Boston did not calculate a control premium on top of its Babies "R" Us valuation. The reality, however, is that a control premium is usually not combined with a DCF analysis, and the KKR Group's $26.75 per share bid implicitly valued Babies "R" Us at a level that exceeded the $10.51 per share high-end value of the First Boston DCF. The $26.75 per share bid also avoided serious execution and tax risks that the Company would have had to overcome in order to make the strategy of selling Global Toys, and continuing to operate Babies "R" Us generate a comparable, much less a superior, rate of return. Any number of substantial reasons, considered later, threatened to make attaining that goal uncertain.

After considering all that information, the board discussed which of the strategic options to pursue. At the end of a lengthy back-and-forth, the board decided that the

**18.** These figures were updated from the preliminary figures shown to the board in February, by updating the DCF analysis. *Compare* JF Aff. Ex. 41 at TRU 0000249 (Mar. 16, 2005) (valuation summary range for Babies "R" Us of $1.75 to $2.3 billion), *with* JF Aff. Ex. 26 at TRU 0008984 (Feb. 21, 2005) (valuation summary range for Babies "R" Us of $1.75 to $2.25 billion), *and* JF Aff. Ex. 41 at TRU 0000250 (Mar. 16, 2005) (DCF range for Babies "R" Us of $1.792 to $2.38 billion), *with* JF Aff. Ex. 26 at TRU 0008986 (Feb. 21, 2005) (DCF range for Babies "R" Us of $1.769 to $2.344 billion).

**19.** The numbers used in calculating the per share value for the Babies "R" Us value component loses some precision due to rounding. The low-end value of $1.75 billion as shown equates to $7.76 per share, implying 225,515,463 shares outstanding. Similarly, but not precisely, the $2.3 billion high-end value implies 227,048,371. In working back to the DCF implied value, I have assumed 226,000,000 outstanding shares. Combined with the DCF high-end value of $2.375 billion, this implies a per share value of $10.51, or 38¢ more than the high-end value produced by the composite range. In other words, building this figure back into the total company analysis, the high-end value for the total company based on the then-current DCF value is $26.14 as opposed to the $25.76 shown to the board at the March 16, 2005 meeting.

best option for maximizing shareholder value was to sell the whole Company to the KKR Group. In connection with that determination, the board took certain actions relating to the compensation of employees and directors. Most pertinently, the board voted to make clear that their own options, as independent directors, vested upon a change of control. This vote was characterized in the board minutes as representing a clarification of the intended operation of the pre-existing option plan. The vote had the effect of putting the independent directors on par with the Company's officers and employees, all of whose unvested options vested upon a change of control.

Thereafter, the board heard yet another valuation presentation, this time from Duff & Phelps. The Duff & Phelps representatives presented a range of values for the Company operating as a single entity of between $19.76 and $21.45 per share. A separate range of values was presented for Global Toys and Babies "R" Us, successfully divided and operating separately, of between $22.23 and $25.33. The representatives of Duff & Phelps explained that all of their valuation ranges assumed an implied premium embedded in the price per share of the Company's publicly-traded common stock attributable to the announcement that the Company was considering a strategic transaction.[20]

The board then instructed the Company's legal and financial advisors to try to conclude a merger agreement with the KKR Group promptly. After that, the independent directors met in executive session to consider the effect of a merger with KKR Group on Eyler and other top executives. The independent directors focused on the fact that Eyler's compensation was largely comprised of stock and options, and therefore that "his interests were closely aligned with that of the shareholders."[21] The board also discussed Eyler's potential severance package, recognizing that the KKR Group might "decide to terminate his services."[22]

After six and a half hours, the board recessed until 10:30 p.m., with the hope that by that time, they would be in a position to consider a final merger agreement. When they reconvened, the board again discussed the merits of going forward, and decided to proceed to approve the proposed merger agreement, subject to its finalization in the wee small hours of that morning. Before doing so, the board received formal opinions from both First Boston and Duff & Phelps that the price of $26.75 per share was fair to the Company's stockholders.

### M. *The Deal Protection Terms Of The Merger Agreement*

During the bidding process, the Company's deal counsel, John Finley of Simpson Thacher, negotiated with counsel for the KKR Group over the terms of a merger agreement. For present purposes, the so-called "deal protection" provisions that they negotiated are what is most pertinent.

Consistent with the evolution of the bidding process, the Company and KKR had first dickered over the terms of an asset purchase agreement involving only Global

---

**20.** The plaintiffs lampoon the Duff & Phelps presentation because the actual bids for Global Toys and the Company suggest higher values for the Company as a whole, and impliedly for Babies "R" Us. Their suggestion that the board should have therefore chuckled at those lower figures exemplifies an immunity to recent historical experience, when buyers of companies and shares of stock have often paid far too much, in situations when a more gimlet-eyed look at fundamental earnings measures and potential would have commended greater caution.

**21.** JW Aff. Ex. 24 at 8961.

**22.** *Id.*

Toys. In that process, the Company had originally sought to restrict KKR to the payment of a termination fee equal to 1% of the value of its bid for Global Toys. In the back and forth, KKR—which as must be remembered, was the top bidder in each of the "final" rounds of bids for Global Toys—got the Company to increase the fee to 3%.

This background sheds some very dim light on an obscure aspect of the record, which relates to why the Company made the negotiation moves it did in its contract talks with KKR. During this litigation, the Company invoked the attorney-client privilege, which had the effect of shielding from the plaintiffs and the court those aspects of the board's process during which Finley advised the board about the contract negotiation process.[23] The plaintiffs did not, for understandable reasons, seek a deposition of Finley to get his views about why he forwarded the drafts he did to KKR or why he reacted with later drafts. If they did, they would not have gotten the full story, as Finley would not have, one presumes, told them what input he had received from his clients.

What is known is that the Company's first March 12 draft of the merger agreement picked up where the asset purchase agreement talks with KKR left off. The Company offered to pay the KKR Group 3% of the Company's equity value, as implied by the final deal terms. The payment of the 3% was, from what I can discern, to be made only when:

1. the Company's board terminates the merger agreement to accept a higher bid or the KKR Group terminates because the board had withdrawn its recommendation of the merger;

2. another offer to acquire the Company exists at the time the Company's stockholders vote on the merger, the Company's stockholders do not approve the merger agreement, and the Company consummates an alternative transaction within the next year; or

3. another offer to acquire the Company exists at the time the merger agreement terminates automatically by having reached its termination date, September 15, 2005, and the Company consummates an alternative transaction within a year.

In the event that the merger agreement was terminated simply because the Company's stockholders voted it down, the Company offered only to reimburse the KKR Group for a to-be-negotiated sum approximating its documented, out-of-pocket expenses.

The Company included in its proposal a "no shop" provision that precluded the Company from continuing to shop itself. But it also insisted on retaining the right to consider a superior proposal if one came along unsolicited. "Superior proposal" is defined in the merger agreement as any bid for assets representing 50% or more of the Company's "consolidated assets, reve-

**23.** The defendants have not sought to rely upon advice of counsel as a justification for the reasonableness of their actions in this regard. Therefore, although it hampers the court's efforts in making a full assessment of the relevant facts, the invocation of privilege has not been made unfairly. In other words, the defendants are not trying to use advice of counsel offensively, while defensively preventing the plaintiffs and the court from testing the reasonableness and propriety of their reli-ance. In past cases, this court has refused to allow boards to tout their reliance on advice of counsel as evidence of their good faith and prudence while shielding the back-and-forth they had with counsel. *See, e.g., Chesapeake v. Shore*, 771 A.2d 293, 301 (Del.Ch.2000) (discounting evidence that a board hired legal and financial advisors as suggesting a fair process when the board invoked privileges to bar examination of the advice given by those advisors).

nues or earnings" that was reasonably capable of being consummated and would be more favorable, in the board's view, than the KKR Group's bid.[24] That retained right was mitigated, however, by the Company's agreement to give the KKR Group a right to match any superior offer made by a rival bidder, so long as it did so within three business days.[25]

The KKR Group countered on March 15 with a request to be paid 4% of the equity value in the circumstances outlined above, and to be paid $50 million in expense reimbursement on a so-called "naked no vote"—that is, a shareholder vote to decline the merger agreement that is not followed by the acceptance of an alternative transaction.

That draft came in the same day as the $26.75 per share bid. Despite knowing that the KKR Group's bid topped Cerberus's final bid by $1.50 per share, the Company did not assent to the KKR Group's request. Instead, as part of the total package of binding commitments it was prepared to accept in order to secure the attractive bid from the KKR Group, the Company agreed to a termination fee of $247.5 million, or 3.75% of equity value, to be paid only in the scenarios outlined above. The $247.5 million presented a more modest 3.25% of enterprise value— that is, the total value of equity and debt the KKR Group would have to pay in order to acquire the Company. For a naked no vote, the Company agreed to pay only up to $30 million in documented expenses.

Thus, as finally adopted, the merger agreement contained four deal protection measures: 1) a fixed termination fee of $247.5 million, equal to 3.75% of equity value or 3.25% of enterprise value—payable for the most part only if the Company terminated the merger agreement in order

to sign up another acquisition proposal within a year; 2) an agreement to pay up to $30 million in documented expenses after a naked no vote; 3) a relatively non-restrictive no-shop clause that permitted the consideration of unsolicited bids; and 4) a temporally-limited match right.

The board discussed these provisions at its March 16 meeting. Because the defendants have invoked the attorney-client privilege, it is, of course, not possible to determine all of what was said. But it seems clear that the board understood the basic terms of the deal protection features. As the plaintiffs point out—and as will be discussed later—the board did not focus on the deal protection measures' effect on a later sale of Babies "R" Us. That is not surprising, since the board never viewed such a transaction, which would have involved the Company selling its unit with the best per store operating margin, and retaining the more mature and less marginally profitable Global Toys division, as an attractive option.

The ambiguity that the merger agreement introduced, in the plaintiffs' mind, was that the 50% trigger in the definition of "superior proposal" excluded any option for the board to terminate if the Company received an attractive bid just for Babies "R" Us, because it was doubtful that Babies "R" Us constituted over 50% of the Company's earnings when proper accounting for expenses was considered, and clear that Babies "R" Us did not constitute over 50% of the Company's assets or revenues. In any event, the 50% trigger did not preclude the board from changing its recommendation if such a bid was received— although that decision would also trigger the payment of the 3% termination fee.

The board did not, it appears, focus on this very minor business point, but I must,

---

24. Merger Agreement § 6.5(a) at 39–40.

25. Merger Agreement § 6.5(b) at 41.

because as we shall later see, it figures in an oddly prominent way in the plaintiffs' arguments.

### N. The Merger Agreement's Effect On The Company's Board And Its Financial Advisor, First Boston

The factual predicate to an evaluation of the plaintiffs' legal arguments would not be complete without a description of the economic effect that the merger will have on the Company's board and First Boston. In moving to expedite the case, the plaintiffs stressed what they perceived to be the distorting effect of the incentives of Eyler, the other members of the board, and First Boston. Since that time, they have backed off from that position considerably but still voice it enough to require a brief explanation of how the board and First Boston will fare if the merger proceeds.

Of the ten directors comprising the board, only Eyler is employed by the Company. All of the directors, however, received compensation for their services in the form of stock options. The value of the independent directors' options range broadly from as little as $150,000 to as much as $1.7 million. Eyler, on the other hand, will receive some $65 million for his equity. This is due largely to the fact that as much as 75% of his compensation under his original employment contract consisted of stocks, options, and grants.

First Boston's incentives in this transaction also warrant mention. First Boston stands to receive $7 million more in fees for the sale of the entire Company than it would have received for the sale of Global

Toys by itself.[26] Arguably, this created a financial incentive for First Boston to steer the board toward a sale of the whole Company. A somewhat more substantial factor is that KKR has been a frequent client of First Boston in the past. Indeed, after the board had approved the merger agreement, First Boston agreed to arrange financing for the KKR Group, for which it will receive an additional $10 million.

### III. The Procedural Standard

The plaintiffs seek a preliminary injunction against the closing of the merger, requesting that I enter an unusual order combining final relief—invalidating the termination fee and the matching rights in the merger agreement—with preliminary relief—holding off the merger vote for 30 days. The plaintiffs claim that this relief will give new bidders a chance to emerge and bid freely in the new judicially created "deal unprotected era," while permitting the merger to close before the KKR Group has a chance to walk away on the merger agreement's drop dead date of September 15, 2005. This request for a preliminary order blue-penciling the merger agreement represents a retreat from the plaintiffs' original request for a standard form of preliminary injunction halting closing of the merger altogether until a final hearing.

■ For reasons I later explain, I need not fully explore the implications of the plaintiffs' preferred form of relief. For now, it suffices to indicate that, to the extent that they simply desire an order halting the closing of the merger, the

---

**26.** The consideration that First Boston would receive for any sale was specified in its engagement letter with Toys "R" Us. Under the engagement letter that was in effect when the merger was finalized, three different deal structures were contemplated, each having a different fee structure. For any sale that did not include Toys Japan or Babies "R" Us (e.g., the sale of Global Toys), First Boston would receive a fee equal to the lesser of 1) $27 million or 2) $8 million plus 0.6% of the aggregate deal consideration. For any sale that differed from the enumerated deal structures (e.g., the sale of the entire Company), First Boston would receive a fee equal to the lesser of 1) $34 million, or 2) $8 million plus 0.6% of the aggregate deal consideration.

plaintiffs must show: 1) a reasonable probability of success on the merits; 2) that they will suffer irreparable injury absent the injunction; and 3) that the harm to the plaintiffs without an injunction outweighs the harm that the injunction will visit upon the defendants.[27] To obtain injunctive relief, either declaring that the termination fee and matching rights are ineffective, as the products of breaches of fiduciary duty, or replacing those ineffective terms with some lower termination fee, the plaintiffs would be required to make the same kind of evidentiary showing required for the entry of final relief—one that essentially proves that there are no material disputes of fact about the inequitable origins of the provisions the plaintiffs seek to have stricken and replaced.[28]

Therefore, under any scenario in which they would obtain an injunction, the plaintiffs must prevail on the merits. For that reason, I turn now to the merits of this case and consider the plaintiffs' argument that the merger agreement is tainted by a number of fiduciary missteps by the Company's board.

## IV. The Merits: Is It Probable That The Board Breached Its Revlon Duties?

### A. The Judicial Role In Evaluating A Revlon Claim

■ In its most summary form, the plaintiffs' claim is that the directors did not fulfill their duties under the landmark case of Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.[29] In Revlon, the Delaware Supreme Court made two important determinations. One is rooted in old trust principles[30] and is mundane to those who believe that stockholders are the only corporate constituency whose best interests are an end, rather than an instrument, of the corporate form, and rests on the proposition that once directors decide to sell the corporation, they should do what any fiduciary (such as trustee) should do when selling an asset: maximize the sales price for the benefit of those to whom their allegiance is pledged.[31] In the corporate context, that means that the directors must seek the highest value deal that can be secured for stockholders regardless of whether it is in the best interests of other corporate constituencies.[32] Or, as the Su-

27. Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 179 (Del.1986).

28. See City Capital Assoc. Ltd. v. Interco, Inc., 551 A.2d 787, 795 (Del.Ch.1988) (holding that, when preliminary injunctive relief sought would, in effect, constitute final relief, such relief should not be awarded unless plaintiff can demonstrated that it is warranted based upon facts not legitimately in dispute).

29. 506 A.2d 173 (Del.1986).

30. Paramount Communications Inc. v. Time, Inc., 1989 WL 79880, at *25 (Del.Ch. July 14, 1989) ("Revlon was not a radical departure from existing law (i.e., it has "always" been the case that when a trustee or other fiduciary sells an asset for cash, his duty is to seek the single goal of getting the best available price)..."); see also Leo E. Strine, Jr., Categorical Confusion: Deal Protection Measures in Stock–for–Stock Merger Agreements, 56 Bus. Law. 919, 927 n. 25 (2001) (stating that the

"Revlon principle grows out of the traditional principle that fiduciaries must sell trust assets for their highest value," and collecting cases such as Robinson v. Pittsburgh Oil Refining Corp., 126 A. 46, 49 (Del.Ch.1924) demonstrating that principle).

31. See, e.g., Paramount Communications, Inc. v. QVC Network Inc., 637 A.2d 34, 44 (Del. 1994).

32. Revlon tempered language in Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946 (Del. 1985), that had indicated that directors, in the context of responding to a takeover bid, could consider the impact the bid would have on other corporate constituencies, such as employees and communities in which the corporation operated. Revlon, 506 A.2d at 176. In the context of a decision to sell the whole company, the directors could only consider those constituencies if doing so is rationally related to some benefit to the stockholders,

preme Court said in its important decision in *Paramount Communications, Inc. v. QVC Network, Inc.*:

> In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.[33]

The other key element of *Revlon* involved the intensity of the judicial review that would be applied in evaluating whether a board of directors fulfilled its obligation to seek the highest immediate value. Consistent with the intuition in *Unocal* and the facts of *Revlon* itself—which involved a sell-side CEO whose disdain for a particular bidder seemed to taint his and his board's ability to impartially seek the best value for their stockholders[34]—the Supreme Court held that courts would subject directors subject to *Revlon* duties to a heightened standard of reasonableness review, rather than the laxer standard of rationality review applicable under the business judgment rule. In practical, if not immediately apparent linguistic terms, this meant that this court had more room to intervene than in a business judgment rule case and could, if it determined that the directors had acted unreasonably, issue an appropriate remedy.

In *QVC*,[35] the Supreme Court said that this intensified form of review involved two "key features:"

> (a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and
>
> (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. The directors have the burden of proving that they were adequately informed and acted reasonably.[36]

■ Critically, in the wake of *Revlon*, Delaware courts have made clear that the enhanced judicial review *Revlon* requires is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith. For example, the Supreme Court has held that the duty to take reasonable steps to secure the highest immediately available price does not invariably require a board to conduct an auction process or even a targeted market canvass in the first instance, emphasizing that there is "no single blue-print" for fulfilling the duty to maximize value.[37] Nor does a board's decision to sell a company prevent it from offering bidders deal protections, so long as its decision to do so was reasonably directed to the objective of getting the highest price, and not by a selfish or

which in that special context must have a relation to price. *Id.* Precisely how stockholder-focused directors must be is not entirely clear but the predominance of the stockholders' interest in receiving the highest, practically available bid in our Supreme Court's *Revlon* jurisprudence is undeniable. *See* Leo E. Strine, Jr., *The Social Responsibility of Boards of Directors and Stockholders in Change of Control Transactions: Is There Any "There" There?*, 75 S. Cal. L.Rev. 1169 (2002) (discussing the effect of *Revlon* on other constituencies).

**33.** *QVC*, 637 A.2d at 44.

**34.** *See Revlon*, 506 A.2d at 176 (noting in understated fashion that Revlon's rebuff of Pantry Pride's advances was "perhaps in part based on [Revlon CEO] Mr. Bergerac's strong personal antipathy to [Pantry Pride CEO] Mr. Perelman").

**35.** *QVC*, 637 A.2d at 45.

**36.** *Id.*

**37.** *Barkan v. Amsted Indus.*, 567 A.2d 1279, 1286 (Del.1989).

idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar.[38]

 Thus, this Court has been "mindful that its task [under *Revlon* ] is to examine whether the directors have undertaken reasonable efforts to fulfill their obligation to secure the best available price, and not to determine whether the directors have performed flawlessly." [39] That distillation remains faithful to teachings of our Supreme Court, through Chief Justice Veasey, in *QVC:*

> Although an enhanced scrutiny test involves a review of the reasonableness of the substantive merits of a board's actions, a court should not ignore the complexity of the directors' task in a sale of control. There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors make a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the boards' determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.[40]

Keeping these instructions in mind, I now turn to describing, addressing, and ultimately rejecting the plaintiffs' argument that the directors, based on this record, most likely breached their *Revlon* duties.

## B. Overview Of The Plaintiffs' Argument That The Board Supposedly Breached Its Revlon Duties

The plaintiffs make two major arguments as to why the Toys "R" Us board failed in their duty to act reasonably in pursuit of the highest attainable value.

 First, they contend that the board acted too hastily once it recognized that a sale of the whole Company, rather than the sale of just Global Toys, might be the best strategic option. When it became a genuine possibility that the entire Company would be sold, the directors acted unreasonably by failing to scour the market again, by canvassing for other, new bidders who, had they known that they could buy not only Global Toys but also the whole Company, might have entered the bidding process. By restricting the opportunity to bid for the whole Company to only the final four bidders for Global Toys, the board unreasonably narrowed the universe of bidders, thereby both preempting a more competitive auction process that might have yielded a higher price than $26.75 per share and denying themselves a reasonable basis to assess the fairness of that price.

Relatedly, the plaintiffs argue that the board compounded the unreasonableness of its initial process by agreeing to deal protection measures that precluded the emergence of a later, topping bid. Although the plaintiffs admit that the board retained the flexibility to consider a higher bid, they argue that this flexibility was of little practical utility because the cumulative effect of the termination fee and

---

**38.** *Id.* at 1286.

**39.** *In re Pennaco Energy, Inc.,* 787 A.2d 691, 705 (Del.Ch.2001).

**40.** 637 A.2d at 45.

matching rights created an unreasonably large bidding advantage for the KKR Group that has dissuaded any other bidder from presenting a topping offer. The plaintiffs therefore claim that a flawed front-end process failed to ensure that all viable buyers knew of the opportunity to make a bid before the board signed up the agreement with the KKR Group, and that too-onerous deal protections on the back-end prevented any possibility of a later cure.

The plaintiffs are represented by highly skilled advocates who recognize that this case hardly presents the paradigmatic context for a good *Revlon* claim, which is when a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price. Here, we have a majority independent board that publicly initiated a broad search for strategic options to increase shareholder value, ruling out no option. That search culminated over a year later in a merger agreement promising stockholders $26.75 per share—a 123% premium over the $12.00 per share price that existed at the time the strategic process was announced.

To attempt to explain why these circumstances reflect, not the happy production of good results for stockholders after days of meetings by directors and thousands of hours of work by management and Company advisors, but rather the inadequate leavings of a sloppy process, the plaintiffs sketch out a picture of a passive board who deferred too easily to the wishes of a CEO, Eyler, and financial advisor, First Boston. I am told that these agents of the board, who, on the surface, appeared to be making every effort to generate the highest value for Company stockholders, in reality were, consciously or subconsciously, driven by selfish motives antithetical to the stockholders' interests.

For Eyler's part, these dark, suppressed motives supposedly led him to hijack what had been a functioning process to sell Global Toys, converting it into a hasty deal for the whole Company (after inexplicably backing the alternative strategy for several months). Eyler, the plaintiffs say, had a general incentive to cause the sale of the Company as a whole, so as to trigger change of control provisions that were personally lucrative, and had a particular incentive to sell to the KKR Group, because KKR offered the best, though not certain, potential for his continued employment.

For its part, First Boston stood to increase its fee by $7 million if the whole Company was sold, an incentive that supposedly played into First Boston's abrupt decision to advise the Company to abandon the primary strategic option that First Boston had been recommending since the summer of 2004. Like Eyler, First Boston supposedly had an incentive to favor the KKR Group in particular.

And, for their part, the nine independent directors were either too enamored with the opportunity of reaping the gains that would flow to them from their accelerated options in the event of a merger[41] or too

**41.** On March 16, 2005, the board voted unanimously to amend the Company's 1999 Non-Employee Directors' Stock Option Plan, clarifying that options granted under that plan would immediately vest in the event of a change of corporate control. The timing of this amendment, mere hours before the board actually voted to turn over control of the Company, may seem questionable at first blush. But because the Company's policies concerning employee stock options also called for immediate vesting upon change of control, the March 16 amendment simply confirmed that the non-employee directors and employee directors would receive equal treatment. In view of the many hours the independent directors devoted to the strategic process, it is unsurprising that even the plaintiffs do not argue that this was actually unfair.

poorly informed to step forward and demand a better process. They therefore acquiesced torpidly once Eyler and First Boston recommended only a truncated, whole-Company auction, and then foisted upon them the execution of a merger agreement with KKR, containing the challenged termination fee and matching rights.

In the succeeding pages, I explain why I reject the plaintiffs' merits arguments. My analysis has three key components.

Initially, I address the plaintiffs' attack on Eyler's and First Boston's motives. In that part of my analysis, I explain why I believe that the plaintiffs' insinuation that Eyler had improper motives is unfair and why their arguments regarding First Boston's motives, although having more color in light of First Boston's own behavior after the merger agreement was signed, are ultimately without force.

I then go on to address whether the board process culminating in the decision to accept the KKR Group's $26.75 per share bid was reasonable. In particular, I consider whether the board had a reasonable basis to conclude that signing up a firm merger agreement with the KKR Group on March 16, 2005 would best maximize immediate shareholder value.

Finally, I consider more specifically whether the board made a reasonable decision to execute a merger agreement containing the challenged termination fee and matching rights.

### C. *Neither Eyler Nor First Boston Tainted The Board's Search For The Highest Value Alternative*

The plaintiffs' implausible and factually insubstantial challenge to Eyler's motives is unfortunate. It is, of course, true that most examples of malfeasance by corporate fiduciaries involve officers who exploit their superior knowledge, power, and influence to extract value from the corporation at the expense of its stockholders. That reality has now led to stock exchange rules that define officers who sit on corporate boards as "non-independent" for all purposes.

That definitional exercise is counterproductive, if taken literally. In most instances, directors who occupy officer positions care as much, and probably more, than the outside directors about protecting the legitimate interests of the corporation and its stockholders. When it comes to determining what products to make or what suppliers to use, CEOs, CFOs and other officers usually have no interest at all that diverges from that of other stockholders. They are well-positioned to act impartially and better positioned than outside directors to act expertly. Such is also the case for directors who might, by affiliation with key industry partners of the company, or the company's bankers, or by virtue of some other status, be deemed non-independent, but who may have the sort of expertise that is invaluable in shaping and implementing a profitable business strategy. Simply put, to be an inside or non-independent director is not a crime, it is a status. And that fact cannot be forgotten by those who apply, or those who make, corporate law. To do otherwise is to risk boardrooms devoid of the very members with the best capacity to help management craft and implement a sound business plan.

Here, the plaintiffs essentially accuse Eyler of the status crime of being a CEO. They tout the fact that he stands to gain over $60 million from the sale of the Company. They play up the fact that the KKR Group conditioned its original February 17 bid for Global Toys on the retention of key (but unspecified) members of management.

But they ignore these key realities:

● Eyler, along with the board of directors, negotiated for the removal of provisions for the retention of Toys

"R" Us management upon which KKR conditioned its bid for Global Toys, which was viewed as a deal-breaker, and KKR abandoned that condition in later bids for the entire company;

- Eyler's compensation from the merger results from the stock and options he holds—he therefore had more incentive than almost anyone to make sure that the board did the best risk-adjusted job it could of getting the best price;[42]
- Eyler himself initiated the strategic process and supported the consideration and pursuit of strategic alternatives that put his job at risk;
- Eyler shaped a board process that involved multiple board meetings, even more Executive Committee meetings, and frequent opportunities for the independent directors to meet without him and with experienced, independent M & A counsel retained precisely to help them, as independent directors, fulfill their duties;
- Eyler faithfully supported and pursued a strategic option involving the sale of Global Toys and the retention of Babies "R" Us, when that strategy had the substantial likelihood of leaving him without a company to run, because Markee, and not Eyler, was to be the CEO of Babies "R" Us in that event;
- Eyler adhered to his support for a sale of Global Toys until Cerberus, not KKR, made a bid for the whole Company of $25.25 per share, at which time he believed that it was best for stockholders to take the limited risk of seeing if the remaining bidders might also like to bid for the whole Company;
- Eyler never tilted the process towards any bidder—he expressly refused to discuss his future with any bidder, and made sure that other members of management also refrained from doing so;[43] and
- Eyler, having adamantly refused to create an appearance problem by talking with bidders about his future before the board settled on a strategic option, ultimately ended up not receiving an offer from the KKR Group to stay with the Company after the merger.

In sum, the plaintiffs' challenge to Eyler's fidelity to the Company and its stockholders is not substantiated. There may be, as I will discuss in the next section, some strategic and tactical decisions made

---

**42.** Commentators on corporate governance have expressed the belief—and Delaware courts have concurred—that stock options, when used and designed prudently, can help align insiders' interests with those of public shareholders, because it gives insiders an incentive to increase the value of the company's shares. *See, e.g., In re Oracle Corp.,* 867 A.2d 904, 930 n. 115 & 116 (Del.Ch.2004) (citing authorities), *aff'd,* 872 A.2d 960 (Del.2005) (Table). Those incentive effects, alas, can also exacerbate the worst instincts of poorly motivated insiders, and perhaps dull the monitoring incentives of independent directors, whose beguilement at rising stock prices (which might simply be the result of accounting gimmickry) might distract them from a concentration on sound financial practices and the need to produce genuine profits through the sale of actual goods and services ... but that, as they say, is a whole nother story.

**43.** Both the board and the Executive Committee were committed to avoiding discussion of future management positions with bidders early in the process. As a means of enforcing that commitment, meetings with bidders were held only in the presence of First Boston, and such meetings were held with all of the final bidders. *See* Eyler Dep. at 222–223. Eyler himself rebuffed KKR's attempts to discuss retention of the Company's management, stating that "he wanted to run a pure process, he wasn't going to negotiate with any of the buyers on management equity, cash compensation, [or] roles and responsibilities going forward." *See* Calbert Dep. at 71.

by Eyler that a rational person could second-guess. But a rational person could not, on this record, infer that Eyler's judgment was tainted by a personal desire to advantage himself at the expense of the Company's public stockholders. Indeed, the fact that Eyler was so heavily invested in the Company's equity no doubt encouraged him to take value-maximizing steps without regard for his future employment because he recognized that a good deal for Toys "R" Us stockholders would leave him very wealthy, too.

Nor, I conclude, can it be fairly said that First Boston tilted the process in order to jack up its fees and profits. It is, of course, true that First Boston stood to earn greater fees if the whole Company was sold than if just Global Toys was sold. That is because First Boston's engagement provided for higher compensation if it found a high-value, whole-Company deal rather than simply a buyer for Global Toys. This feature of the contract was designed to provide an incentive for First Boston to seek higher value, and has been recognized as proper by our courts.[44]

Most important, First Boston's supposedly nefarious scheme is even more logically inconsistent than the one that Eyler supposedly embarked upon. After all, First Boston had indicated to the board in summer 2004 that a sale of the whole Company was not likely to be a fruitful avenue to pursue. And, of course, First Boston is said to have undermined the board's pursuit of the highest value by, among other things, failing to indicate in autumn 2004 that several of the parties interested in Global Toys had said they also were interested in looking at a purchase of the whole Company. Up until the

time when Cerberus offered $25.25 per share on the evening of March 7, 2005, First Boston did not advise abandonment of a focus on selling Global Toys and, if anything, urged the Company to stay the course and put the Global Toys deal to bed.

To buy the plaintiffs' story, one must assume that when Cerberus made its bid, a light went off in First Boston's head. It was only then that First Boston, a very large investment bank with serious reputational interests at stake, suddenly realized, in an epiphanic blaze of financial acumen, that it might make a full $7 million more by tainting its advice to its client. It therefore promptly turned on a dime and (falsely, the plaintiffs insinuate) advised its client to consider whole Company bids because a sale of the entire Company would be preferable to a sale of just Global Toys. Without indulging the naïve pretense that investment bankers are immune from financial temptation, one can confidently fail to embrace this implausible theory of advisorial disloyalty.

That said, First Boston did create for itself, and therefore its clients, an unnecessary issue. In autumn 2004, First Boston raised the possibility of providing buy-side financing to bidders for Global Toys. First Boston had done deals in the past with many of the late-round financial buyers, most notably with KKR. The board promptly nixed that idea. At the board's insistence, First Boston had, therefore, refused to discuss financing with the KKR Group, or any bidder, before the merger was finalized.[45] But, when the dust settled, and the merger agreement was signed, the board yielded to a letter re-

---

44. *See, e.g., In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9, 22 (Del.Ch.2004); *accord In re Vitalink Communications Corp. S'holders Litig.*, 1991 WL 238816, at *10 (Del.Ch. Nov.8, 1991), *aff'd sub nom., Grimes v. John*

*P. McCarthy Profit Sharing Plan*, 610 A.2d 725 (Del.1992).

45. Valla Dep. at 164–65.

quest by First Boston to provide financing on the buy-side for the KKR Group.

That decision was unfortunate, in that it tends to raise eyebrows by creating the appearance of impropriety, playing into already heightened suspicions about the ethics of investment banking firms. Far better, from the standpoint of instilling confidence, if First Boston had never asked for permission, and had taken the position that its credibility as a sell-side advisor was too important in this case, and in general, for it to simultaneously play on the buy-side in a deal when it was the seller's financial advisor. In that respect, it might have been better, in view of First Boston's refusal to refrain, for the board of the Company to have declined the request, even though the request came on May 12, 2005, almost two months after the board had signed the merger agreement.

My job, however, is not to police the appearances of conflict that, upon close scrutiny, do not have a causal influence on a board's process. Here, there is simply no basis to conclude that First Boston's questionable desire to provide buy-side financing ever influenced it to advise the board to sell the whole Company rather than pursue a sale of Global Toys, or to discourage bidders other than KKR, or to assent to overly onerous deal protection measures during the merger agreement negotiations.[46]

Finally, while I am addressing the plaintiffs' argument that improper motives infected the board's process, I will also note

that I find no basis to conclude that the independent directors consciously abandoned a higher value alternative in order to reap personal gains from the merger. If the directors believed that a different strategy promised higher value to the Company's stockholders than KKR's $26.75 per share bid, their stock and options provided a rational incentive for them to pursue that more lucrative end and to reject KKR's whole Company offer.

Put bluntly, if the Toys "R" Us board failed to maximize shareholder value, it did so, not because it or its advisors were improperly motivated, but because it made errors in judgment.

D. *The Board's Decision To Agree To Sell The Company For $26.75 Per Share Was The Result Of A Reasonable Deliberative Process*

The plaintiffs, of course, argue that the Toys "R" Us board made a hurried decision to sell the whole Company, after feckless deliberations, rushing headlong into the arms of the KKR Group when a universe of worthier, but shy, suitors were waiting to be asked to dance. The M & A market, as they view it, is comprised of buyers of exceedingly modest and retiring personality, too genteel to make even the politest of uninvited overtures: a cotillion of the reticent.

For that reason, the Company's nearly year long, publicly announced search for strategic alternatives was of no use in testing the market. Because that announced

---

**46.** By stating this, I do not want to be perceived as making a bright-line statement. One can imagine a process when a board decides to sell an entire division or the whole company, and when the board obtains a commitment from its financial advisor to provide a certain amount of financing to any bidder, in order to induce more bidders to take the risk of an acquisition. These and other scenarios might exist when roles on both sides

for the investment banker would be wholly consistent with the best interests of the primary client company. In general, however, it is advisable that investment banks representing sellers not create the appearance that they desire buy-side work, especially when it might be that they are more likely to be selected by some buyers for that lucrative role than by others.

process did not specifically invite offers for the entire Company from buyers, the demure M & A community of potential Cyranos, albeit ones afraid to even speak through front men, could not be expected to risk the emotional blow of rejection by Toys "R" Us. Given its failure to appreciate the psychological barriers that impeded possible buyers from overcoming the emotional paralysis that afflicts them in the absence of a warm, outreached hand, the Company's board wrongly seized upon the KKR Group's bid, without reasonable basis (other than, of course, its $350 million superiority to the Cerberus bid and its attractiveness when compared to the multiple valuations that the board reviewed).

The plaintiffs supplement this dubious big-picture with a swarm of nits about several of the myriad of choices directors and their advisors must make in conducting a thorough strategic review. Rather than applaud the board's supple willingness to change direction when that was in the stockholders' best interest, the plaintiffs instead trumpet their arguable view that the directors and their advisors did not set out on the correct course in the first instance. Even the reasonable refusal of the Company to confirm or deny rumors in the Wall Street Journal is flown in to somehow demonstrate the board's failure to market the Company adequately.

It is not hyperbole to say that one could spend hundreds of pages swatting these nits out of the air. In the fewer, but still too numerous, pages that follow, I will attempt to explain in a reader-friendly fashion why the board's process for maximizing value cannot reasonably be characterized as unreasonable.

I begin by noting my disagreement with the plaintiffs about the nature of players in the American M & A markets. They are not like some of us were in high school. They have no problem with rejection. The great takeover cases of the last quarter century—like *Unocal*, *QVC*, and—oh, yeah—*Revlon*—all involved bidders who were prepared, for financial advantage, to make hostile, unsolicited bids. Over the years, that willingness has not gone away.[47]

Given that bidders are willing to make unsolicited offers for companies with an announced strategy of remaining independent, boards like Toys "R" Us know that one way to signal to buyers that they are open to considering a wide array of alternatives is to announce the board's intention to look thoroughly at strategic alternatives. By doing that, a company can create an atmosphere conducive to offers of a non-public and public kind, while not putting itself in a posture that signals financial distress.

In that regard, the defendants plausibly argue that if the Company's board had put a "for sale" sign on Toys "R" Us when its stock price was at $12.00 per share, the ultimate price per share it would have received would likely have begun with a "1" rather than a "2" and not have been anywhere close to $26.75 per share. The board avoided that risk by creating an environment in which it simultaneously recognized the need to unlock value and signaled its openness to a variety of means to accomplish that desirous goal, while at the same time notifying buyers that no emergency required a sale.

By this method, I have no doubt that Toys "R" Us caught the attention of every retail industry player that might have had an interest in a strategic deal with it. That is, in fact, what triggered calls from PETsMART, Home Depot, Office Depot,

---

**47.** Think, for example, of the recent Oracle bid for Peoplesoft, or Qwest's vigorous pursuit of MCI.

Staples, and Best Buy, all of whom potentially wanted to buy some of the Company's real estate.

In a marketplace where strategic buyers have not felt shy about "jumping" friendly deals crafted between their industry rivals,[48] the board's open search for strategic alternatives presented an obvious opportunity for retailers, of any size or stripe, who thought a combination with all or part of the Company made sense for them, to come forward with a proposal. That they did not do so, early or late in the process, is most likely attributable to their inability to formulate a coherent strategy that would combine the Company's toy and baby store chains into another retail operation. The plaintiffs' failure to identify, or cite to any industry analyst touting the existence of, likely synergistic combinations is telling.

The approach that the board took not only signaled openness to possible buyers, it enabled the board to develop a rich body of knowledge regarding the value not only of the Company's operations, but of its real estate assets. That body of knowledge provided the board with a firm foundation to analyze potential strategic options and constituted useful information to convince buyers to pay top dollar.

The plaintiffs, of course, fault the board's initial decision not to market the entire Company, and instead to focus on selling Global Toys and retaining Babies "R" Us. But the fact that a sale of the whole Company, at prices exceeding the value ranges identified as plausible to the board in the summer of 2004, later became possible, provides no basis for concluding

that the board did not act reasonably earlier.

I find no plausible basis in the record to believe that First Boston, Eyler or anyone else eschewed a full Company sale alternative earlier for any reason other than they thought it would not maximize value. At that time, there was obviously concern that Global Toys might sell more easily as primarily a real estate play, and that it might be difficult to find a buyer for everything.

In that scenario, particularly given the dearth of strategic buyers who had expressed any serious interest in the Company, it was reasonable for the board and First Boston to concentrate on selling Global Toys to a financial buyer. That would enable the Company to unlock value by selling its major division to a buyer that would most likely seek a complementary strategy of capitalizing on some of the real estate value of Global Toys while running a streamlined, lower-cost toy retailing business capitalizing on the well-established Toys "R" Us brand name. Meanwhile, the Company could, after distributing the bulk of the sales proceeds, focus on continuing to run Babies "R" Us profitably.

To that end, the Company canvassed a broad array of financial buyers. In that process, some of the buyers signaled a possible interest in buying the entire Company. First Boston, I have found, did not signal that soft interest as clearly as it should have to the board.

That failure, however, did not undermine the reasonableness of the board's search for highest value. As the defendants have reasonably noted, any buyer

---

**48.** *See* Robert E. Spatt, *The Four Ring Circus—Round Nine; A Further Updated View Of The Mating Dance Among Announced Merger Partners And An Unsolicited Second Or Third Bidder,* (2005) (presented at the Tulane Corporate Law Institute) (collecting cases where deal jumping occurred or was attempted).

Spatt's collection has been sequentially updated since its initial publication in 1 No. 9 M & A Law 1 (Feb. 1998). Spatt is a partner at Simpson, Thacher & Bartlett, LLP, who also played a role in this transaction, but his data was collected long before, and is completely independent from, this litigation.

who was seriously interested in the whole Company would likely have had a serious interest in Global Toys. Moreover, as noted previously, capitalists are not typically timid, and any buyer who seriously wanted to buy the whole Company could have sent a bear hug letter at any time, if it wanted to be genteel about expressing an interest. In all reasonable likelihood, the board's sales process for Global Toys provided the most credible and likely buyers of the whole Company with information that would have gotten their acquisitorial salivary glands going.

As the board entered the new year, 2005, its process resulted in the presentation of firm bids for Global Toys that were very attractive. The board did not stop there; instead, it sought yet another round of "final" bids. Even then, when Cerberus floated the idea of a full Company bid at $23.25, the board seriously considered it but decided that unless a higher bid was presented, it was too risky to the Global Toys sale process to consider a sale of the whole Company. Keeping an open mind, the board indicated that if a more attractive bid came along, the Executive Committee could elicit bids from the remaining bidders for Global Toys—i.e., the board made a reasoned choice in pursuit of higher value that took into account upside potential and downside risk.

Eyler, in consultation with the Executive Committee members, reasonably decided that it was worth conducting a limited whole Company auction among the final bidders, once Cerberus made a bid of $25.25 per share.[49] That bid was very attractive in light of the valuation information that they had received throughout the strategic process and presented the potential for the Company to capture good value with very low risk.

Of course, the plaintiffs fault the board for not testing the patience of the bidders who had made two "final" bids for Global Toys even more. I, by contrast, cannot conclude that the board's fears were unwarranted. Moreover, the decision to time limit the final auction process cannot be deemed unreasonable given the length of the process to date and the risk of losing one of the finalists.

Likewise, the decision to accede to KKR and Vornado/Bain's request to present a joint bid cannot be deemed unreasonable. The Cerberus consortium had done that earlier, as to the Global Toys business only. Had First Boston told KKR and Vornado/Bain "no," they might not have presented any whole Company bid at all. Their rationale for joining together, to spread the risk that would be incurred by undertaking what the plaintiffs have said is the largest retail acquisition by financial buyers ever, was logical and is consistent with an emerging practice among financial buyers. By banding together, these buyers are able to make bids that would be imprudent, if pursued in isolation. The plaintiffs' continued description of the KKR Group's bid as "collusive," is not only linguistically imprecise,[50] it is a naked attempt to use inflammatory words to mask a weak argument. The "cooperative" bid that First Boston permitted the KKR Group to make gave the Company a powerful bidding competitor to the Cerberus consortium, which included, among others, Goldman Sachs.

---

**49.** That Eyler played a key moment-to-moment role with First Boston and Simpson Thacher at this stage is not problematic. It was his duty to bring his managerial and financial savvy to bear on the auction process. That is what he was paid to do.

**50.** *See, e.g.,* Merriam–Webster's Online Dictionary, 10th Edition (defining "collusion" as "a secret agreement or cooperation, especially for an illegal or deceitful purpose"), *available at* http://www.m-w.c om/cgi-bin/dicti on-ary?book=Dicti onary&va=collus ive.

By the time the board met on March 16, it had already met 14 times during the strategic review process. The Executive Committee had already met 18 times. The board had regularly monitored the process, controlled managerial conflicts, and met outside the presence of management. The board knew that no strategic buyers for the whole Company had made any serious, non-public expression of interest during a more than year long period when it was publicly known that the Company was open to value-creating strategic options—not even after the Wall Street Journal article opined that the board was pondering a bid by Cerberus. Therefore, the board entered the meeting that day well-positioned to decide whether to sell the Company or to sell Global Toys, or to do neither.

Despite its prior work, the board did not truncate its effort on March 16. To the contrary, the board fully discussed all of its options. The plaintiffs, of course, must admit the following undisputed facts regarding what the board knew when it voted to accept the $26.75 per share offer:

- That price represented a 123% premium over the $12.00 per share price at which the Company's shares had traded when the strategic process was publicly announced;

- That price exceeded the top range of the sum-of-the-parts valuation presented to the board in the summer of 2004;

- That price exceeded the top range of First Boston's updated DCF ($19.60 to $25.58 per share) and its comparable companies analysis ($16.35 to $20.98 per share), and was within an eyelash of the top range of its comparable transactions analysis ($19.32 to $27.04 per share);

- That the price therefore also far exceeded the mid-range of First Boston's DCF ($22.59 per share), its comparable companies ($18.67 per share), and its comparable transactions analysis ($23.18 per share);

- That the price was in excess of the top ranges of value presented to the board in its belts and suspenders presentation from Duff & Phelps; and, of course,

- That the price exceeded Cerberus's $25.25 per share bid by $350 million—$1.50 per share.[51]

The plaintiffs also admit that the board did in fact consider whether the $26.75 bid was attractive in light of the strategic alternative that the board had previously thought most valuable to the stockholders: a sale of Global Toys and the retention of Babies "R" Us. As part of its process, the board heard specifically from Babies "R" Us's top manager, Markee, about its prospects. They also were presented with specific information about the value of Babies "R" Us from First Boston.

Among other things, the board knew:

- That the bidders for Global Toys were expecting the Company to continue to operate Babies "R" Us and had fashioned contracts dealing with the transitional services that the buyers would provide to the Company during the period when it was building the infrastructure necessary for Babies "R" Us to function autonomously;

- That the Company could not easily turn around and sell Babies "R" Us immediately after selling Global Toys, as any buyer of Babies "R" Us would not be buying a fully functioning autonomous company but one that was

---

**51.** The March 16 valuation presentation was just the most recent valuation analysis presented to the board. *See, e.g.,* First Boston Project Toddler Preliminary Discussion Materials from February 21, 2005.

dependent on the former Global Toys business for support;

- That for Babies "R" Us to be functional required additional operating costs of $85 million per year, a figure that could grow in sizable increments;
- That First Boston had conducted an updated DCF analysis of Babies "R" Us's standalone value with a range of $1.8 to $2.375 billion, or $7.96 to $10.51 per share; [52]
- That First Boston had conducted a comparable companies analysis of Babies "R" Us yielding a standalone value of $1.75 to $2.25 billion, or $7.74 to $9.96 per share; and
- That the combination of First Boston's updated DCF and the existing comparable companies analysis yielded an updated summary sum-of-the-parts valuation of Babies "R" Us with a value range of $7.76 to $10.13 per share that was presented to the board.

All of this information is obviously relevant to determining whether it was preferable to sell the whole Company at $26.75 per share or to sell just Global Toys, and retain the Babies "R" Us business.

But the plaintiffs seize upon a feature in the board book that they believe created a fatal flaw in the board's reasoning. To help the board, First Boston presented a chart that considered the value that would result if the board decided to sell the Global Toys business to the KKR Group (which was also the top bidder for that asset), and retain Babies "R" Us and the Company's interest in Toys Japan. Under that scenario, it was assumed that the Company would distribute up to $15.75 per

share it received from the KKR Group for Global Toys (including some additional cash from borrowing) to the stockholders, presenting them with up to $15.75 in immediate value (of which $14.27–$14.44 would be realized from the Global Toys divestiture).

With that in mind, the key elements of First Boston's chart were as follows:

- Global Toys Sale And Cash Distribution — up to $15.75 per share
- Japan Division — $1.11 to $1.41 per share
- Babies "R" Us standalone value — $7.76 to $10.13 per share
- Unspecified Expenses — $(0.13) to $(0.22) per share
- Resulting Total Value — $23.00 to $25.76 per share

The problem with this straightforward analysis, the plaintiffs say, is the Babies "R" Us valuation. In a footnote, First Boston explicitly indicated that its valuation of Babies "R" Us did not include a control premium. Therefore, the plaintiffs claim that the board failed to reasonably consider the value of this alternative, having been unknowingly led to believe that this alternative was only worth $7.76 to $10.13 per share, when it was really worth that plus a control premium for Babies "R" Us.

For reasons I will soon explain, this scenario, which assumes that a control premium would be paid on top of First Boston's value range, is not very plausible. But let's indulge that assumption, for the sake of analysis. Assume a 25% control premium on top of the values presented to the board as a valuation for Babies "R" Us. This would increase the valuation range to $9.70 to $12.66 per share.[53] Even

---

52. Again, rather than fathom the intricacies of First Boston's precise analysis, I use 226,-000,000 outstanding shares as an approximation implied by the share values and total values that First Boston supplied to the board regarding the value of Babies "R" Us. This is good enough for a rough estimate and, more-

over, is the type of estimation that any board members confronted with the First Boston materials could easily have calculated as a rough approximate value.

53. $7.76 * 1.25 = $9.70; $10.13 * 1.25 = $12.66.

more favorably, the plaintiffs suggest relying on the highest analyst estimate then available for Babies "R" Us of $13.50, which was put out by Citigroup.[54] With this optimistic revision, the plaintiffs suggest that plugging this higher figure into First Boston's sum-of-the-parts-analysis reveals the obvious path to maximum shareholder value that the board irrationally eschewed. In their view, the board might have taken the top price for Global Toys, then turned around and sold Babies "R" Us for a control premium, well above the $12 per share mark. They envision this as an obvious strategy, while admitting that it was not an option that was presented to the board as a realistic possibility.

In sum, the plaintiffs suggest that the more realistic way to reconstitute the First Boston chart is along the following lines:

- Global Toys Sale And Cash Distribution up to $15.75 per share

- Japan Division $1.00 per share

- Higher Babies "R" Us standalone value (via a higher valuation, e.g. Citigroup's $13.50 valuation, or via a control premium as discussed below) $13.50 per share (Citigroup) or, $9.70 to $12.66 per share (for control)

- Unspecified Expenses $0 [55]

- Resulting Total Value $30.25 per share (Citigroup) or $24.95 to $28.29 per share (for control)

Thus, claim the plaintiffs, the board missed a clear opportunity to sell far above the $26.75 bid, and erred by foreclosing that option.

The plaintiffs' reliance on the reference to the absence of control premium in the board book and the fantasy they build around it, however, tends to highlight the weakness of their case, rather than to buttress a rational conclusion that the board stood befuddled at the strategic crossroads

and unreasonably trod down the path of lesser value. Numerous reasons can be found in the record to illustrate why this is so. I now surface a few.

For starters, the plaintiffs ignore the considerable execution risk inherent in the option involving the retention of Babies "R" Us. Those risks included the possibility that Wal–Mart would come after infants next, and squeeze the margins of Babies "R" Us; the difficulty and cost of ending Babies "R" Us's dependence on Global Toys; and the difficulty of figuring out how to dispose of the controlling, but not majority, interest in Toys Japan. To get the value depicted on First Boston's chart, particularly the very top value, the Company had to successfully navigate all these risks.

There is no guarantee that Babies "R" Us will command a control premium later. It must first demonstrate its earnings capacity on a stand-alone basis. As alluded to above and as presented to the board on March 16, Babies "R" Us was heavily subsidized by Global Toys' infrastructure. The board received information bearing on the separation expenses indicating that that corporate allocation of expenses to Babies "R" Us would be $85 million in 2005, and could increase further.

Second, plaintiffs' model assumes that the most optimistic "up to" $15.75 value alluded to in the First Boston chart is a lock. It is not. That value comprised not just sale proceeds, but also a distribution of additional debt to be taken on by the surviving Babies "R" Us entity. Moreover, the possible profit from the Global Toys sale becomes jeopardized by the very act of signaling that Babies "R" Us would be marketed and sold after Global Toys was disposed of. With only Global Toys on the market, a buyer of Global Toys

---

54. JF Aff. Ex. 23 at Toys 007485.

55. The plaintiffs ignore the 13 cents to 22 cents per share costs in First Boston's analysis.

knew that it was getting a cooperative partner committed to working out shared infrastructure concerns over time in a way that best advantaged both companies. If Babies "R" Us was also to be sold, the potential buyer of Global Toys would price into its offer the fact that its infrastructure partner was unknown, and might potentially be uncooperative. Worse, the potential buyer of Global Toys might be compelled by contract to provide a competitor with infrastructure services during a contentious and extended workout—a condition that reasonably might cause a discount in bids. Potential purchasers of Babies "R" Us, of course, would face similar concerns.

Indeed, even the plaintiffs' certainty that Toys Japan would yield $1.00 per share is unwarranted. According to a footnote in First Boston's valuation presentations, the proposed value range did not include the fact that any sale of Toys Japan would trigger negative tax consequences of approximately $0.45 to $0.55 per share.[56]

Most important, it was not unreasonable for First Boston to focus on valuing Babies "R" Us as if it was not going to be sold for an important reason: that was the plan! Once Global Toys was sold, the Company's stockholders would own shares in a corporation that was functionally Babies "R" Us. Those shares would trade on a minority basis in the marketplace. Under that scenario, Company stockholders would not have access to a control premium on Babies "R" Us until it was sold, in an indefinite time frame sometime in the future. The board, of course, had looked at valuation analyses—the First Boston and Duff & Phelps valuations—that examined whether the $26.75 per share for the whole Company (including Babies "R" Us) was attractive in light of the control premiums paid for comparable companies in acquisitions. By this comparison, the $26.75 per share looked like an excellent, value-maximizing deal.

The board's decision emerges as a no less reasoned one, even under the assumption that the board should have considered an improbable scenario in which the sale of Global Toys would be followed by an immediate auction of Babies "R" Us, at a time when Babies "R" Us was not yet capable of operating independently. The improbability of that scenario is deepened by another business reality. The sales process for Global Toys had revealed that financial buyers thought there was a value to the synergistic operation of Global Toys and Babies "R" Us. Those synergies would not be sold under this scenario—a new, higher cost Babies "R" Us operation would be.

But even if that business might have fetched a healthy control premium, the board's choice to sell the whole Company for $26.75 cannot be second-guessed as unreasoned. In this regard, I note my demurrer from First Boston's indication that its valuation of Babies "R" Us did not include a control premium in the first place. It is not my understanding that a DCF valuation conducted using the Gordon growth model, as First Boston's updated DCF did, embeds a minority discount. Rather, that value is a value of the entity itself. Adding a control premium on top of a DCF is not, to this mind, intuitively or theoretically logical. Indeed, because a DCF model of the kind I have described is not infected by a minority discount, it is the model most consistent with what the Company's stockholders would receive in an appraisal, their pro rata share of the Company's value. For this reason, the board of Toys "R" Us had before it precisely the kind of information our Supreme Court has said it should have.[57]

---

**56.** Selling Babies "R" Us also involved potentially severe tax consequences.

**57.** In the odd decision in *McMullin v. Beran*, 765 A.2d 910 (Del.2000), the Supreme Court

Even assuming a 25% control premium, the range for Babies "R" Us becomes $9.70–$12.66.[58] Recalculating total implicit Company value using these figures yields a range of $24.95–$28.29 with a mid point of $26.62. Thus, even assuming a 25% premium for Babies "R" Us, the $26.75 bird-in-hand bid represented a value above the mid-point implied by the Global Toys bids with none of the execution risks, described above, that those options imply. This, on top of the fact that this valuation method, one of four valuations of the entire company that the board considered, was the valuation method that produced the highest range compared to the three other traditionally accepted valuation methods.

As a final point, I note that market analysts had come to top range estimations of the Company's total value similar to First Boston's. None of their high-end valuations materially exceeded the KKR Group's bid of $26.75 per share.[59] Significantly, even analysts that valued the Babies "R" Us component somewhat higher (which the plaintiffs cite), arrived at similar figures for the entire company (which the plaintiffs do not stress). This suggests that these analysts recognized the problems implicit with the plaintiffs' approach and further illustrates that the board reasonably forwent the plan of divestiture the plaintiffs suggested at oral argument, the sell-both-pieces-separately-for-top-dollar-plan.

### E. The Board Did Not Act Unreasonably In Agreeing To The Deal Protection Measures

■■ The plaintiffs' other major argument is that the board acted unreasonably by signing a merger agreement with the KKR Group that, in their view, includes deal protection measures that preclude other bidders from making a topping offer. In support of this argument, the plaintiffs offer up expert testimony from two professors, R. Preston McAfee, an economist at the California Institute of Technology, and Guhan Subramanian, a professor at Harvard Law School.

Together, the professors advance the position that the deal protection measures in the merger agreement might have deterred some superior offers for the Company.[60] For his part, McAfee believes matching rights are a stiff barrier to rival

---

said that a board selling a company should consider whether the sale looks advisable in light of what the shareholders would likely receive in an appraisal. Among the oddments in that decision was an assumption that the board in that case was not presented with such information, even though they heard two valuation presentations. If those presentations contained DCF valuations, or a similar model, they focused the board directly on appraisal value. That is, of course, obviously true here. This does not mean that the DCF the board saw is the same as a law-trained judge might later produce, but it does mean the board focused on the same value measures that would be relevant in an appraisal.

58. $7.76 * 1.25 = $9.70; $10.13 * 1.25 = $12.66.

59. See JF Aff. Ex. 23 (Feb. 2, 2005—Citigroup raises its target price for the whole company from $23.00 to $27.00, assuming a successful restructuring, valuing Babies "R" Us at $13.50 per share); JF Aff. Ex. 29 (March 1, 2005—Prudential Equity Group values the total company at $24.00 to $26.00, with a $24.00 target price and Babies "R" Us at $12.00); JF Aff. Ex. 30 (March 1, 2005—UBS values the total company at $26.75 with a $12.00 valuation for Babies "R" Us); JF Aff. Ex. 35 (March 10, 2005—Harris Nesbitt raises target price to $27.00, the high end of their range).

60. McAfee's affidavit is more sweeping. Based on what appears to be a very simplistic and incomplete understanding of the facts, McAfee fails to see the rationale for a variety of tactical choices made by the board and its advisors. But McAfee did not seriously evaluate the real world situation the board faced and then opine that he, knowing the actual risks that alternative decisions involved, would have acted differently. I illustrate later in this section just one of the many forks in the road that McAfee did not precisely describe, much less choose between.

bidders. Subramanian concentrates more on termination fees, and argues that those fees, when combined with matching rights, are a potent obstacle to emerging bidders. In a series of rapidly evolving affidavits, Subramanian claims to have developed data that suggests that the termination fee in the merger agreement—which is 3.75% of equity value and 3.25% of total transaction value—exceeds that which is typical of deals this size.[61] Consistent with work he has done with Professor Coates, Subramanian claims that any termination fee of 3% or more "has a reasonable likelihood of foreclosing higher value bidders."[62]

Furthermore, in his scholarly work Subramanian argues that combination of a termination fee and matching rights raises the fears second bidders have of suffering a "winner's curse." This is the anxiety that a first bidder will match the initial topping bid, only to refuse to match the next topping gambit, leaving the second bidder having paid more than was economically rational. This fear, Subramanian points out, is further exacerbated by the common circumstance that first bidders often have superior information on the target, and presumably know when to say when. Of course, the other side of this story is that the first bidder has taken the

risk, suffered the search and opportunity costs, and done the due diligence required to establish the bidding floor.

Subramanian also fears that termination fees and other deal protections are tending to become stronger and that this creep will ultimately inhibit, more generally, the vibrancy of the M & A market. He therefore urges the admonition to this court to "provide guidance to transactional lawyers" on the "acceptable level of deal protections in Revlon deals."[63] His clients, the plaintiffs' lawyers, put it more forcefully and ask me to strike down, via the mighty judicial blue pencil, the termination fee and the matching rights, without, of course, jeopardizing their ability to take the $26.75 per share and run if the KKR Group merger turns out to be best value, after all.

The half the loaf that I will give them is an answer to their request for guidance.

■ It is no innovation for me to state that this court looks closely at the deal protection measures in merger agreements. In doing so, we undertake a nuanced, fact-intensive inquiry of the kind recommended by Professors Subramanian and Coates in their scholarly work. In that work, they do not advocate that courts strike down any termination fee above X%

---

61. The rapidly evolving nature of Subramanian's affidavits illustrates the caution courts should use in relying upon social science literature that has not survived rigorous scrutiny over time. In his affidavits, Subramanian, over a period of days, presented different calculations of the average percentage of equity and enterprise value that termination fees constituted in a sample of public company deals. In his most recent affidavit, Subramanian claimed that he and other scholars had been relying on inconsistent calculations from a leading source of data. There is no way for me, or the defendants, to stop the injunction clock and conduct a rational exploration of this midnight-hour contention. The reality that even distinguished scholars often have to refine their initially published arguments and policy recommendations, even though they

have a more leisurely period of time to come up with them in the first place, might suggest that more empathy is due to fiduciaries who must, by business necessity, make difficult choices in the faster-moving context of real world commerce. This is not to say that scholarly work should not inform a fiduciary's, or the judiciary's, thinking. It should, but in a measured way that recognizes the necessarily imprecise and arguable nature of most "social science" research.

62. Subramanian Aff. ¶ 22 (quoting John C. Coates IV & Guhan Subramanian, A Buy–Side Model of M & A Lockups: Theory and Evidence, 53 Stanford L.Rev. 307, 347 (2000)).

63. Subramanian Aff. ¶ 41.

of equity or enterprise value, suggesting instead that "deals with break-up fees over 3% of deal value should be given a particularly hard look." [64]

 In other words, they advocate the type of close examination of the reasonableness of deal protections measures that is contemplated by the *Unocal* and *Revlon* standards, and practiced in decisions like *QVC, Ace Limited v. Capital Re Corp.*,[65] and *Phelps Dodge.*[66] That reasonableness inquiry does not presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal. Instead, that inquiry examines whether the board granting the deal protections had a reasonable basis to accede to the other side's demand for them in negotiations.[67] In that inquiry, the court must attempt, as far as possible, to view the question from the perspective of the directors themselves, taking into account the real world risks and prospects confronting them when they agreed to the deal protections. As *QVC* clearly states, what matters is whether the board acted reasonably based on the circumstances then facing it.[68]

Here, neither of the plaintiffs' distinguished experts has said what he would have done had he faced the choice that the Toys "R" Us board did. On March 16, the Toys "R" Us board had two bids for the whole Company. The Cerberus bid was for $25.25 per share. The KKR Group bid was for $26.75 per share—a gaping $350 million higher.

The plaintiffs posit that the board should have refused to sign the merger agreement with the KKR Group until the termination fee was reduced to some less onerous level and the matching rights were removed. In fact, the board did negotiate the termination fee down to 3.75% from the 4.0% that KKR had proposed on March 15, putting the $350 million bid differential at some risk to do so. The plaintiffs, however, assume that the board should have pressed harder and that the KKR Group would have yielded further, but still kept its bid at $26.75.

But what if the KKR Group had said, "if you want to cut the termination fee to 3%,[69] our offer is only $25.75 per share?"

---

64. *Coates & Subramanian*, 53 Stan. L.Rev. at 382.

65. 747 A.2d 95 (Del.Ch.1999).

66. *Phelps Dodge Corp. v. Cyprus Amax Minerals Co.*, 1999 WL 1054255 (Del.Ch. Sept.27, 1999). In my view, then Vice–Chancellor, now Chief Justice, Steele's reasoning in *In re IXC Communications, Inc. S'holders Litig.*, 1999 WL 1009174 (Del.Ch. Oct.27, 1999), is not of a materially different spirit. Although using the business judgment rule framework, his *IXC* decision involved a hard look at the reasonableness of deal protections, consistent with a properly conducted reasonableness review that gives due deference to the board's judgment.

67. *Coates & Subramanian*, 53 Stan. L.Rev. at 378–88.

68. 637 A.2d at 45. The recent Supreme Court decision in *Omnicare, Inc. v. NCS* *Healthcare, Inc.*, 818 A.2d 914, 933 (Del.2003) represents, one senses, an aberrational departure from that long accepted principle. *Id.* at 947 (Veasey, C.J., dissenting); *id.* at 950 (Steele, J. dissenting).

Of course, I recognize that, just as the later emergence of a topping bid does not necessarily mean that the board acted unreasonably in protecting an earlier bid it believed to be the most favorable, the absence of a later topping bid did not mean that the board's prior actions were not unreasonable. If a board adopts deal protection measures that are draconian, to quote a term, then its own acts might be the reason no new bidder came forth.

69. Frankly, I cannot, as someone who has done a lot of negotiation, imagine retracting the 3% and matching rights offer. That sort of "oh, by the way ..." should only be put on the table when it is necessary to protect a

What was the board to do then? Even worse, suppose the KKR Group had asked, "what did the other groups bid?" What was First Boston supposed to say, knowing that the KKR Group had topped Cerberus by a full $1.50 per share or $350 million? In that dynamic, only the reckless would have been insensitive to the worry that the KKR Group's bid might drop if it were asked to give up the matching rights or to accept a termination fee of less than 3%.

Let's plausibly imagine how that exceedingly awkward negotiating session that the plaintiffs desire might have gone:

First Boston/Simpson Thacher: The board wants 3.0% on the termination fee and to get rid of the matching right. KKR: Fine, you can have $25.75 per share and the 3.0% or the $26.75 with 3.75% protection for our trouble. And we want the match in either case.

First Boston/Simpson Thacher: No, no. We demand 3.0% and the $26.75; take it or leave it.

KKR: What did Cerberus and Apollo bid?

First Boston/Simpson Thacher: We can't comment.

KKR: I think we're done.

First Boston/Simpson Thacher: (with panicky overtones) Please don't go . . .

KKR: Click

First Boston/Simpson Thacher: Expletive Deleted.

Faithful fiduciaries and their advisors, facing a dynamic of this kind, would reasonably fear that the KKR Group might somehow get wind that it made an overbid and be chary about losing the proverbial bird in hand. It is this tradeoff—between getting the highest price the board could from KKR Group right then and there, and the limited opportunity of receiving a higher bid from a well-canvassed market

by reducing the termination fee and eliminating the match rights—which the board and its advisors had to address, and which the plaintiffs and their ivory tower-based experts refuse to realistically engage.

■ As the plaintiffs must admit, neither a termination fee nor a matching right is per se invalid. Each is a common contractual feature that, when assented to by a board fulfilling its fundamental duties of loyalty and care for the proper purpose of securing a high value bid for the stockholders, has legal legitimacy.

The KKR Group was no doubt aware of that reality and the Company was in no position to deny the KKR Group any deal protections. Furthermore, unlike the plaintiffs, I do not view it as absurd that the Company was willing to offer the KKR Group deal protections as strong, on a percentage basis, for a whole Company bid as it had for a sale of Global Toys. In this regard, it is important to recall that the Company had sought a 1% termination fee originally in the proposed Global Toys asset sales agreement and had, in the course of extracting two "final" and winning bids from the KKR Group, eventually assented to a 3% fee. The inducement of staying at 3% in its initial merger agreement draft might therefore have been thought reasonably necessary to induce an attractive whole-Company bid from a wearied bidder, by signaling that the Company was credibly committed to selling and, separately, reasonably recognizing the KKR Group's need for adequate compensation if it risked the opportunity costs of tying up nearly $7 billion of capital in pursuit of an acquisition of the Company that might not come to fruition.

Contributing to this negotiating dynamic, no doubt, were prior judicial prece-

client against a material disadvantage. For the sake of analysis, I have indulged the idea

of pulling the matching rights offer back, although it seems a less-than-credible posture.

dents, which suggested that it would not be unreasonable for the board to grant a substantial termination fee and matching rights to the KKR Group if that was necessary to successfully wring out a high-value bid.[70] Given the Company's lengthy search for alternatives, the obvious opportunity that unsolicited bidders had been afforded to come forward over the past year, and the large gap between the Cerberus and the KKR Group bids, the board could legitimately give more weight to getting the highest value bid out of the KKR Group, and less weight to the fear that an unlikely higher-value bid would emerge later. After all, anyone interested had had multiple chances to present, however politely, a serious expression of interest—none had done so.

Nor was the level of deal protection sought by the KKR Group unprecedented in magnitude. In this regard, the plaintiffs ignore that many deals that were jumped in the late 1990s involved not only termination fees and matching rights but also stock option grants that destroyed pooling treatment, an additional effect that enhanced the effectiveness of the barrier to prevent a later-emerging bidder. In cases like *McMillan v. Intercargo* and *Pennaco Energy*, this court approved deal protection measures in the *Revlon* context that were nearly as substantial, taking all

factors into account, as those here.[71] In *Pennaco Energy*, this court upheld an informed board's decision to sign up a sales deal, after negotiating with a single bidder, that included a 3% termination fee and matching rights. The court did so because the board was well-informed, clearly desired the best price, and because any serious bidder who wanted to present a materially higher bid could still do so.[72]

In view of this jurisprudential reality, the board was not in a position to tell the KKR Group that they could not have any deal protection. The plaintiffs admit this and therefore second-guess the board's decision not to insist on a smaller termination fee, more like 2.5% or 3%, and the abandonment of the matching right. But that, in my view, is precisely the sort of quibble that does not suffice to prove a *Revlon* claim.

To begin with, the plaintiffs' assertion that the deal protection package here would deter a bidder willing to pay materially more than the KKR Group does not convince me at all. I have no doubt that it operates to deter someone who would want to make a bid that is trivially larger than the KKR Group's bid. But it is not the concern of our law to set up a system that promotes endless incremental bidding. To do so risks creating an incentive for lower

**70.** Even the controversial majority opinion in *Omnicare* recognized that boards possess this legitimate authority. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003); *see also Brazen v. Bell Atlantic Corp.*, 695 A.2d 43 (Del.1997).

**71.** *McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 (Del.Ch.2000) (opining that it was "difficult to see how a 3.5% fee would have deterred a rival bidder who wished to pay materially more ..."); *In re Pennaco Energy, Inc.*, 787 A.2d 691 (Del.Ch.2001) (termination fee of 3% and matching rights did not unreasonably preclude emergence of a later bid). Among other precedents of this court upholding deal protections comparable in strength to

those in this case are: *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265 (Del.Ch. Jan.25, 1999), *aff'd*, 741 A.2d 16 (Del.1999) (finding reasonable a payment of a total of 4.167% to the original merger partner if a topping bidder got the company); *Lewis v. Leaseway Transp. Corp.*, 1990 WL 67383 (Del.Ch. May 16, 1990) (dismissing claim challenging a transaction involving a 3% break up fee).

**72.** Indeed, in his own scholarly work with Professor Coates, Subramanian reported that termination fees exceeding 3% of enterprise or deal value were relatively common. *Coates & Subramanian*, 53 Stan. L.Rev. at 347.

initial deal prices because initial buyers will have less closing certainty.

Furthermore, there are actual examples that prove that a package of this kind would not deter a fervent bidder intent on paying a materially higher price for the Company. In the recent struggle for control of MCI, Qwest bid repeatedly to try to top Verizon, despite its possession of matching rights.[73] In *Capital Re*, the case was triggered by a bid that topped an initial merger partner protected by a termination fee and matching rights.[74] Examples like these are simply not that unusual.[75]

The plaintiffs attempt to strengthen their claim by focusing on the fact that financial buyers are typically more deterred by termination fees than strategic buyers because financial buyers can't reap gains from operational synergies. But these were exactly the same universe of buyers that had already been broadly solicited at the commencement of the strategic review, and were therefore least likely to have missed out on the opportunity to bid. Indeed, eleven of those entities initially contacted remained in the final round

of bidding, in one consortium or another. It is the unknown, synergistic strategic bidder that the plaintiff hopes is waiting in the wings, but such a bidder is precisely the least likely to be deterred by the existing deal protections.

Moving from this larger perspective to the precise circumstances of this case, let us consider the economic rationality of the plaintiffs' argument that the board made an unreasonable decision to accept more deal protection than it desired in exchange for the certainty of getting $26.75 per share. But let us do so in view of the actual economic choice that confronted the board of Toys "R" Us on March 16. They knew that the KKR Group had outbid Cerberus by $350 million, or $1.50 per share.

Assume that the board wished to reduce the termination fee of 3.75% of equity value down even further to 3%, or the plaintiffs' preference of around 2.5%. Recognize that at 3.75%, the termination fee equaled about a dollar per share. Here is a table that shows the reduction in inhibition that would have been achieved by successful moves of that kind: [76]

| | Existing Deal | At 3.0% | Change from Existing Deal | At 2.50% | Change from Existing Deal |
|---|---|---|---|---|---|
| Break up fee | $247.5 mil. | $198 mil. | ($49.5 mil.) | $165 mil. | ($82.5 mil.) |
| % of Equity Value | 3.75% | 3.0% | | 2.50% | |
| Per Share Value | $0.99 | $0.792 | ($0.198) | $.66 | ($0.33) |

**73.** For more details, see the MCI Form 8–K, filed February 14, 2005, at pages 46–48 describing those matching rights.

**74.** 747 A.2d 95, 99 (Del.Ch.1999).

**75.** Recall the epic struggle for Warner–Lambert, in which Pfizer's topping bids resulted in the breakup of Warner–Lambert's friendly merger with American Home Products.

**76.** The following charts are derived using the rule of thumb suggested by defendants without objection, namely that a $10 million variation in total deal value roughly equates to 4¢ per share.

The effect on a bidder willing to present topping bids of $27.50, $28, $29, and $30.25 are shown below:

| | Actual Cost Per Share to Second Bidder to Make the Bid | | |
| Implied Valuation Of Topping Bid | With $247.5 mil. (3.75%) termination fee | With $198 mil. (3.0%) termination fee | With $165 mil. (2.50%) termination fee |
| --- | --- | --- | --- |
| $27.50 | $28.49 | $28.29 | $28.16 |
| $28.00 | $28.99 | $28.79 | $28.66 |
| $29.00 | $29.99 | $29.79 | $29.66 |
| $30.25 | $31.24 | $31.04 | $30.91 |

As these charts show, while higher bids certainly incrementally increase total bid costs, the vast majority of this increase stems from the bid increase itself. This illustrates the choice the board faced regarding the termination fee. To hold out for its original request for a 3% fee involved the board putting at risk an offer $1.50 higher than the next best bid, in order to cut the inhibiting effect of the termination fee to a second bidder by 20¢ per share. And the board would have been taking this risk in a context when it was reasonable to assume that the emergence of a later bidder was unlikely.

It would be hubris in these circumstances for the court to conclude that the board acted unreasonably by assenting to a compromise 3.75% termination fee in order to guarantee $26.75 per share to its stockholders, and to avoid the substantial risk that the KKR Group might somehow glean the comparatively large margin by which it had outbid Cerberus. The plaintiffs, and their experts Subramanian and McAfee, never say how they would have handled the final negotiations with the KKR Group if they were representing the Company and knew that the Cerberus final bid was only $25.25.

In the prior section, I highlighted the plaintiffs' contention that the company might be worth as much as $30.25 per share. At that value, a second bidder could rationally pay up to $29.26 per share, assuming the 3.75% fee—or $2.51 more per share than the KKR Group. At that level, the termination fee would constitute only 3.41% of the second bidder's total cost. Thus, as it stands, any second bidder valuing the company at that level already has leeway to make a number of topping bids—$27.25, $27.50, $28, and so forth up to $29.26—that are materially higher than the KKR Group's merger price, while still acting rationally.[77] Therefore, the board's decision not to risk the $26.75 in order to drop a second bidder's

---

**77.** Remember, of course, that this overstates the second bidder's disadvantage. The KKR Group's actual expenses likely exceed the $30 million mark by some large margin, especially given that both KKR and Bain/Vornado independently incurred substantial expense in the Global Toys sales process. By the time of a later post-signing topping bid, moreover, a first merger partner will often have invested in substantial integration planning costs and other expenses related to an anticipated closing.

marginal costs to an even slighter level does not appear to deter bids in the value range that the plaintiffs claim is attainable.

Moreover, the plaintiffs are in the odd position of requesting that I condemn the board as unreasonable for risking $26.75 per share for a 20¢ or 33¢ per share reduction in a termination fee to 3% or 2.5%, having recently sold a substantial number of their Toys "R" Us shares for prices averaging 75¢ to 95¢ below the $26.75 per share deal price. By the plaintiffs' own logic, this act was an unreasonably risk averse investment decision on their part as fiduciaries, and considerably more risk averse than the acts of the board they urge me to condemn.

In sum, I conclude that the board's decision to assent to the deal protection measures was reasonable. In so ruling, I do not imply that those measures will not "rebuff a bidder who wishe[s] to top [the KKR Group's bid] by a relatively insubstantial amount that would not have been substantially more beneficial to [the Company's] stockholders, but to call such an insubstantial obstacle "draconian" is inconsistent with the very definition of the term." [78] Deal protections, of course, do provide a bidding cushion for merger partners that makes small, margin-topping bids non-viable. When that cushion results, as it did here, from a good faith negotiation process in which the target board has reasonably granted these protections in order to obtain a good result for the stockholders, there is no grounds for judicial intrusion.

In that regard, I close my consideration of the plaintiffs' argument that the deal protections presented an unreasonable barrier to a topping bid for the entire Company by commenting on the experts' reference to second bidders' fear of a "winner's curse" when faced with winning an auction over an initial merger partner. This idea, again, is the notion that the overbidder will pay too much, and emerge having over-leveraged itself and likely the target, too.

■ The central purpose of *Revlon* is to ensure the fidelity of fiduciaries. It is not a license for the judiciary to set arbitrary limits on the contract terms that fiduciaries acting loyally and carefully can shape in the pursuit of their stockholders' interest. Even less is it the purpose of *Revlon* to push the pricing of sales transactions to the outer margins (or beyond) of their social utility. If second bidders fear that any move beyond a small topping bid might leave them making an imprudent bid for a public company, it is not clear why our society benefits by encouraging bids of that type or how it would be harmed by their preclusion. For diversified investors as likely to own the shares of an acquiror as a target, it is often the case that the premium paid in an M & A deal goes from one pocket to another. For society as a whole, there are real economic and social costs to the acquisition of healthy, profitable companies at an excessive price. Creditors, consumers, workers, and communities can suffer when that happens. If the marginal cost to a second bidder of the difference between a 2.5% termination fee without matching rights and a 3.75% termination fee with matching rights really raises a reasonable concern that any material higher bid would be economically irrational, then that suggests that the board got close to the Company's maximum economic value, when measured by fundamental measures of its earning power.

This is not to say that this court is, or has been, willing to turn a blind eye to the adoption of excessive termination fees, such as the 6.3% termination fee in *Phelps*

---

**78.** *Intercargo,* 768 A.2d at 506.

*Dodge* that Chancellor Chandler condemned, that present a more than reasonably explicable barrier to a second bidder, or even that fees lower than 3% are always reasonable.[79] But it is to say that *Revlon*'s purpose is not to set the judiciary loose to enjoin contractual provisions that, upon a hard look, were reasonable in view of the benefits the board obtained in the other portions of an integrated contract.

Regrettably, before leaving the discussion of deal protections, I must address yet one more argument made by the plaintiffs. This argument is that the deal protections precluded bidders from coming forward to present a bid only for Babies "R" Us. The reason for that is that it is not clear or even likely that any bid for Babies "R" Us could constitute a superior proposal in view of the 50% threshold contained in the merger agreement defining that term. If it fails to meet this threshold, under the merger agreement, the board would lack an out permitting it to consider such a hypothetical proposal. Moreover, even if the board could consider an offer for Babies "R" Us, or more likely, permissibly exercises its right to change its recommendation on the merger vote in view of such a bid, bidders know that the price of a successful bid for Babies "R" Us alone would require payment of the full $247.5 million termination fee to the KKR Group, a payment that plaintiffs and their expert decry as an unconscionable 7.5% of the likely value of a bid for Babies "R" Us alone.

This argument fails the straight face test. For one thing, it is not clear why the KKR Group should receive less of a termination fee simply because the Company signs up a deal selling a significant part of the assets the KKR Group contracted to buy. The reality would be the same for the KKR Group, they would have lost the Company to another later-emerging alternative transaction.

More importantly, the plaintiffs posit a sale of Babies "R" Us alone as if it were a viable strategy. But there is no evidence it was ever considered thus. No serious overtures for Babies "R" Us alone were ever made during the strategic process. And the board, for rational and obvious reasons, never believed that selling the Company's most marginally profitable and fastest growing retail business, while retaining the more mature Global Toys business, made any sense. Indeed, the adverse tax implications of such a strategy are profound and were flagged, in part, in the summer of 2004. The record just will not sustain the notion that the board unreasonably foreclosed a valuable strategic avenue by agreeing to deal protections that inhibited its ability to receive bids for Babies "R" Us alone.

### F. The Plaintiffs Have Failed To Show That They Face A Serious Threat Of Irreparable Injury Or That The Equities Tilt In Their Favor

 Having failed to show a reasonable probability of success on the merits, the plaintiffs have not earned the extraordinary relief that they seek. Even less have the plaintiffs proven that the deal protections in the merger are, as a matter of law, ineffective as the product of fiduciary breaches. As a result, I need not and do not reach their argument that this court should either strike down those provisions altogether or blue-pencil them back to reasonable limits, all before a trial has even been held.[80] To grant that sort of manda-

---

79. Nor, I believe, should we be entirely immune to the preclusive differences between termination fees starting with a "b" rather than an "m."

80. In a speech in an academic setting, I once ventured the notion that such blue-penciling might possibly make policy sense. Leo E. Strine, Jr., *Categorical Confusion: Deal Protection Measures In Stock–for–Stock Merger Agreements*, 56 Bus. Law. 919, 941 n. 71

tory relief would, in my view, be inappropriate on disputed facts, and plaintiffs who seek such relief should move promptly, not for a preliminary injunction hearing, but for an expedited trial.[81]

That said, the plaintiffs have also failed to persuade me that the other required elements for the issuance of an injunction are satisfied. Unlike in the *Revlon* and *QVC* cases, or in other cases brought by thwarted bidders, the primary plaintiffs in this case are not presenting a bid themselves. They therefore do not face the unique harm of losing an opportunity to acquire Toys "R" Us. They merely face the loss of dollar value from the theoretical possibility that the deal protections have precluded a topping bid. This seems to be harm that can be rectified adequately in a later appraisal proceeding.

Furthermore, the balance of the equities does not favor these plaintiffs. Having already hedged their bets by selling a large number of shares for prices south of $26.75 per share, they are not in a high ground position to put at risk the opportunity for other Company stockholders to vote to accept that northerly price. As the early voting returns now stand, the Company's stockholders, other than the plaintiffs, overwhelmingly favor the deal.

Regardless of that trend, the bottom line is that the public stockholders will have an opportunity tomorrow to reject the merger if they do not think the price is high enough in light of the Company's stand-alone value and other options. If the stockholders vote no, the only price will be the payment of $30 million to the KKR Group, which is likely less than its actual expenses to date. Notably, the plaintiffs have dropped any claim that the merger vote ought to be enjoined because the proxy statement is materially misleading. Therefore, the vote of the stockholders, if affirmative, may well be a fully informed one that will have ratification effect, foreclosing as a practical matter, all claims of breach of fiduciary duty about the process leading to the merger.

To issue an injunction preventing stockholders from choosing for themselves in the present circumstances poses more potential to do them harm—through, among other things, delay of their receipt of the merger consideration—than good. I refuse the plaintiffs' invitation to bring about this peril by judicial order.

## V. *Conclusion*

For the foregoing reasons, the plaintiffs' request for a preliminary injunction is DENIED. IT IS SO ORDERED.

(2001). In so venturing, I never indicated that this court could strike down such measures as final relief on a paper record involving disputed facts. Moreover, there is a good deal to be said for the notion that this court should simply enjoin a merger agreement's closing preliminarily if it finds that the deal protection measures threaten the irreparable preclusion of materially higher bids or the coercion of a stockholder vote. That creates an incentive for acquirors to be more modest in the first instance, as they risk more if they overreach, and also leaves to the proper parties the opportunity for a new round of bar-

gaining. This case, however, does not require me to decide between the various remedial approaches that might be warranted in any particular case.

81. The plaintiffs' confident argument that a mandatory injunction of that kind would not release the KKR Group from its obligation to close tends to prove the need for the trial. The plaintiffs constantly changing request for injunctive relief did not surface that contention until very late in this fast-moving litigation, foreclosing the creation of a fair record on that important point.